MAURITZ et al. v. SCHWIND et al.
No. 4667.

Court of Civil Appeals of Texas. Amarillo.
Jan. 4, 1937.

Rehearing Denied Feb. 15, 1937.

Rose & Sample, of Edna, and P. R. Rowe, Jr., Albert P. Jones, and Baker, Botts, Andrew & Wharton, all of Houston, for appellants.

Edw. C. Thomas, J. W. Ragsdale, `and Linebaugh & Guittard, all of Victoria, for appellees.

MARTIN, Justice.

Laura E. Schwind and Faith Summers, mother and daughter, joined pro forma by their respective husbands, sued appellants for about 2,500 acres of land in the aggregate, consisting of a large number of small tracts in two adjoining subdivisions. Appellants thereafter filed a cross-action against the above parties, together with Frank L. Brown and Valley Fruit Farm & Garden Company (hereafter referred to as the Company) as additional parties.

Appellants briefly and in substance pleaded:

1. A purchase of all of said land at valid tax sales held in 1931 and 1932.

2. Purchase of same at trustee's sale in 1932, under foreclosure of a valid trust deed against said land, given to secure. the amount of an indebtedness then past due and unpaid.

3. In the alternative, for foreclosure of certain alleged liens.

Trial was to the court. Judgment for appellees, except as to a minor matter, not necessary to mention.

The record in this case is lengthy and complicated. We are faced with a multitude of contentions, many of which we do not mention or discuss in view of the disposition we make of this case. Suffice it to say that the main question here so far as appellees are concerned revolves around the status of the "Company" as a corporation, at certain dates hereafter mentioned.

Some of the more essential facts are: The lands in question passed by mesne conveyances to the "Company," an Arizona corporation, which never had a permit to do business in Texas. All the stock in the Company was owned by appellees Laura E. Schwind and Faith Summers, on and prior to its alleged dissolution by the Arizona Corporation Commission, as hereafter more fully stated. On December 30, 1921, a trust deed was executed on the lands herein involved to secure a note for purchase money thereof in the sum of $49,288.50, dated October 31, 1919, payable five years after date, to the order of Lafayette Ward. A foreclosure suit was filed on this October 31, 1928. Thereafter, an extension agreement was delivered by the Company, extending the time of payment of said note to October 31, 1929. Subsequent to this, in 1931 and 1932, the said lands were sold to appellants at tax sale, and thereafter, in October, 1932, at substitute trustee's sale under a foreclosure of said trust deed. On June 27, 1928, the Arizona Corporation Commission entered a purported order dissolving the "Company" and declaring it legally dead. Additional facts will sufficiently appear in subsequent discussions of law questions involved.

It is here contended: (1) That the above extension agreement having been signed by the "Company" after its dissolution in fact amounted to no agreement, and therefore limitation had barred the note in question prior to the said foreclosure; and (2) the tax judgments in question were void because the real owners of said land, to wit, Laura E. Schwind and Faith Summers, were not parties thereto, the citation being to the Company and to "all persons owning or having or claiming any interest" therein, under article 7342, R.S. 1925.

Both these questions turn necessarily on whether or not said corporation was in fact dissolved and therefore legally dead after June, 1927, and the effect to be given to the purported action already mentioned of the Arizona Corporation Commission. To prove this important fact, and over appellants' objection, appellees first introduced its Exhibit No. 18, which was as follows:

"To all to Whom these Presents shall come, Greeting: I, M. C. Hankins, Secretary of the Arizona Corporation Commission, do hereby certify that the annexed is a true and complete transcript of the Articles of Incorporation of Valley Fruit Farm and Garden Company which were filed in the office of the said Arizona Corporation Commission on the 29th day of October, A. D. 1919 at 1:30 o'clock P. M. as provided by law, and of the

"Final Decree

"in the above entitled matter "which was entered by the said Arizona Corporation Commission on the 28th day of June A. D. 1927, as provided by law.

"In Witness Whereof, I have hereunto set my hand and affixed the official seal of the Arizona Corporation Commission, at the Capitol, in the city of Phoenix, this 26th day of February, A. D. 1934.

"[Seal] [Signed] M. C. Hankins, Secretary.
"By Asst. Secretary.

"Arizona Corporation Commission
"(As a court of record)
"In the matter of Valley Fruit Farm & Garden Company No. 2352-C-29898
"A Domestic Corporation Final Decree

"In this action the Commission, as a court of record, having full and complete jurisdiction of the subject matter and of the above named corporation, and having heretofore, to-wit on the 27th day of December, 1923, made and entered its preliminary decree suspending the certificate of incorporation and the exercise of corporate powers by said above named corporation for and because of its failure, for two years or more, to file the annual report and pay the annual registration fee as required by law; and now more than six months having expired since making the preliminary decree aforesaid, and said corporation not having applied for reinstatement and having failed to pay such delinquent fees together with the costs of this action, as provided in chapter 36 of the Acts of the Regular Session of the Sixth Legislature of the State of Arizona (1923).

"It is therefore ordered, adjudged and decreed that said Valley Fruit Farm and Garden Company, a domestic corporation, be and the same is hereby declared to be legally dead, and the Certificate of Incorporation issued to said corporation by the State (or Territory) of Arizona on the 29th day of October 1919, be and the same is hereby revoked, cancelled and annulled.

"Done in open court this 28th day of June 1927.

"Loren Vaughn, Acting Chairman."

Later, during the trial, this same order was again introduced, but had appended to it the following certificates:

"I, M. C. Hankins, secretary of the Arizona Corporation Commission, do hereby certify that the annexed is a true and complete transcript of the Final Decree entered in the matter of Valley Fruit Farm and Garden Company, Case No. 2352-C-29898, on the 28th day of June, A. D. 1927, by the said Arizona Corporation Commission sitting as a Court of Record, as provided by law. * * *

· "I, Wilson T. Wright, Chairman of the Arizona Corporation Commission, do hereby certify that the annexed attestation of the Secretary of the Arizona Corporation Commission is in due form."

The first of these certificates was dated February 26, 1934, and the last September 27, 1934.

█ Exhibit No. 18 was plainly inadmissible as it was not accompanied by a certificate of the "judge, chief justice or presiding magistrate that such attestation is in due form" as required by the Act of Congress relating to such matters.

"In order that a copy of a judicial record of a sister state may be admissible under the federal statute, there must be a compliance with the requirements of such statute as to the form and mode of authentication. It is usually considered that a substantial compliance is sufficient, although it has been said that 'the importance of strict adherence to the act of congress on the authentication of records is quite apparent.' * * *

"All that is required is that the attestation of the record shall be in comformity with the form used in the state whence it comes, and the exclusive and conclusive evidence of this fact is the certificate of the presiding judge of that court." 22 C. J. p. 845.

Section 687, title 28, U.S.Code Ann., provides in part: "The records and judicial proceedings of the courts of any State or Territory, or of any such country, shall be proved or admitted in any other court within the United States, by the attestation of the clerk, and the seal of the court annexed, if there be a seal, together with a certificate of the judge, chief justice, or presiding magistrate, that the said attestation is in due form. And the said records and judicial proceedings, so authenticated, shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the State from which they are taken."

The only proof made by appellees of the authority of the Arizona Corporation Commission to act in this matter was the introduction of sections from the 1928 Revised Code of Arizona. The first relates to a voluntary dissolution of a corporation, and the next to a judicial one, both inapplicable to the present situation. The third was as follows: "Whenever any corporation has failed, for two years, to pay the registration fee and file the annual report, or either, the corporation commission shall make a finding of such fact and enter an order requiring such corporation to show cause, at a time therein named, why its right to transact business or to do business in this state, should not be declared terminated, and its articles of incorporation and its license to do business in this state revoked and annulled. The time named in the order shall not be less than twenty days, if a domestic corporation, nor less than thirty days if a foreign corporation, and not less than ninety days if an alien corporation. Such order shall be served upon the corporation by delivering to its statutory agent, or by mailing by registered mail to such agent at his last address known to the commission, a copy of such order. If at the time fixed in the order the corporation fail to show cause, the commission shall enter an order revoking and annulling the certificate of incorporation and license to do business of such corporation within the state." Rev.Code Ariz. 1928, § 663.

█ Admittedly, if the Arizona Corporation Commission is an administrative body as distinguished from a court, its acts may not be certified under the Acts of Congress. Proof of these could easily be and would have to be made in another way

in such event. Can we conclude from the above that such body is a court with the right and power to exercise judicial functions? Again, is the secretary of such body the custodian of its records, possessing the powers and exercising the duties of a "clerk," as that term is used in the federal statute? We presume here that the laws of Arizona are the same as Texas in the absence of evidence to the contrary. The Texas statute provides for a judicial dissolution of a corporation by the courts and for a summary forfeiture of its right to do business in Texas by the Secretary of State upon grounds not essentially different from the quoted statute of Arizona. See articles 1387, 7091, and 7092. We apprehend that it would not be seriously contended that any such act of the Secretary of State was a judicial one, or that such office is anything other than administrative.

Administrative is defined as follows: "Commonly the word has been defined as ministerial; pertaining to administration, particularly, having the character of executive or ministerial action; and, when particularly applied to official duties connected with government, executive, a ministerial duty; one in which nothing is left to discretion." 2 C.J.S. p. 56.

"A court is a body in the government to which the public administration of justice is delegated. The one common and essential feature in all courts is a judge or judges having some sort of judicial functions, power, or authority." Rupert v. Alturas County Com'rs, 2 Idaho (Hasb.) 19, 2 P. 718, 720.

We have no commission in Texas corresponding to that mentioned. Here the Secretary of State performs duties, corresponding, so far as this record shows, in their essentials to those intrusted to the Arizona Corporation Commission. The only applicable Arizona law introduced in evidence to differentiate it from that in Texas was the one quoted. Apparently, the Arizona Corporation Commission may find as a fact whether or not a corporation has filed its annual report and paid its annual registration fee. Presumably this amounts to no more than a pronouncement of what its records conclusively show. The remainder of its duties is mandatory. It "shall" issue notice and "shall" revoke its "license to do business," etc. We do not interpret the latter as having the force of a "judgment" of a court of record. The law pronounces the result which follows a failure in the respects mentioned. A tax collector enters a penalty on his books for failure to pay taxes by a certain date. Is this entry a judgment of a court? We think not.

We are not to be understood as holding that said commission is not in fact a court. What we do hold is that this record does not sufficiently evidence such fact, so as to make its acts come within the federal statute quoted above.

It is further contended that such a record may not be authenticated by a "secretary." We think this would depend upon the facts and circumstances. "Clerk" and "Secretary" are sometimes used synonymously. 56 C.J. p. 1270.

A "clerk" has been defined as follows: "An officer of a court who keeps its minutes, or records its proceedings, and has the custody of its records and seal." 11 C. J. p. 843.

The definition of "secretary": "An official scribe, amanuensis, or writer; a person employed to write letters, dispatches, orders, public or private papers, records, and the like." 56 C.J. p. 1269.

We quote:

"We cannot take judicial knowledge of the laws of the state of New York, or look to the statutes of the same for information as to its judiciary system and the organization of its courts. * * *

"The act of congress requires the attestation of the clerk and the seal of the court annexed, together with a 'certificate of the judge, chief justice or presiding magistrate, as the case may be.'

"As was said by Chief Justice Hemphill in Harper v. Nichol, 13 Tex. [151] 161, 'The certificates of the clerk and judge must show that they are the clerk and the judge of the court in which the judgment was rendered.' Randall v. Burtis, 57 Tex. 362.

"It has been held that it is essential to the authentication of a copy of a judgment under section 905, U.S.Rev.Stats. [28 U.S.C.A. § 687], in order to render it admissible in evidence by reason of such authentication, for the certificate of the clerk to be made by the clerk of the court in person, and not by his deputy (Wharton on Ev. § 101; Hutchins v. Gerrish, 52 N.H. 205, 13 Am.Rep. 19; Duvall v. Ellis, 13 Mo. 203; Wilburn v. Hall, 16 Mo. 426; Willock v. Wilson, 178 Mass. 68, 59 N.E.

757), and for his certificate to be certified by the judge to be in due form (Trigg v. Conway, Hempst. 538, 14 Fed.Cas. No. 14, 172; Craig v. Brown, Pet.C.C. 352, 3 Fed. Cas. No. 3,328; Catlin v. Underhill, 4 McLean, 199, 2 Fed.Cas. No. 2,523)." Edwards v. Smith (Tex.Civ.App.) 137 S.W. 1161, 1163 (writ dism.).

It is not necessary in view of our holding above to expressly pass upon this question, and quote the authorities because of another possible trial of this case.

■ If proof in the future shows the Arizona Corporation Commission to be a court, then in our opinion its chairman as "presiding magistrate" may properly join in the authentication of its records as he did above.

■ Whether such commission is a court is provable by the laws of Arizona, not by the ipse dixit of its secretary contained in a purported certificate.

It is contended by appellants that estoppel was conclusively proven against appellees, and, if not, an issue as to same existed upon which the court should have made a finding. The trial court filed findings of fact and conclusions of law, but refused to make any findings upon facts requested by appellants and intended by them as findings upon such issue. As a corollary to the above, appellants likewise requested findings upon Schwind's authority as agent. The court's action in these matters was properly made the subject of a bill of exception.

Appellees' counter proposition in reply to the above is as follows: "In the absence of a false representation or concealment of a material fact, made with knowledge thereof, actual or constructive, to one who was without such knowledge or the means of ascertaining same, made with the intention that he act thereon, followed by such action in reliance thereon to his prejudice, or the absence of any of these elements, there can be no estoppel."

The background of this controversial matter is briefly this: The Arizona Corporation held title on all the dates mentioned herein to the land involved here. Upon its alleged dissolution in June, 1928, title to said real estate supposedly vested in appellees Mrs. Laura Schwind and Faith Summers, wife and daughter respectively of Wm. F. Schwind, the alleged agent. Thereafter and. theretofore, the said Schwind acted as president of said company, signing deeds in its name as president, rendering said lands for taxes, and otherwise managing same. The inference is justified that such acts amounted to a public and continuous representation that the company was in fact a live corporation. Suit was filed to foreclose the lien given to secure the note as aforesaid. Thereafter, the extension agreement already mentioned was delivered by the company, and in its name as a corporation, acting through Schwind as its president. Before limitation had run under said extension agreement, a foreclosure was had, and appellants became the purchasers, at a substitute trustee's sale. If the extension agreement was void, because the company no longer existed, then appellees' present plea of limitation is good. The appellants present here the argument, among others, that appellees are estopped to set up its nonexistence after having procured a dismissal of said suit upon the faith of an extension agreement, signed by said company as a corporation; that they cannot here plead the invalidity of the said act of the purported corporation, and at the same time retain the fruits of that which they acquired by such act. Otherwise stated, having saved their property from foreclosure by pretending to be an existing corporation, and signing and delivering an extension contract as such, they will not now be heard to dispute the truth of that which would enable them to plead limitation.

■ We quote from some of the authorities:

"The principle is one of estoppel in the interest of a sound administration of the laws whereby the regularity or even validity of an act procured by one himself cannot be raised—not that the act is valid, for it may not be, and estoppel does not make valid the thing complained of, but merely closes the mouth of the complainant." Spence v. State Nat. Bank (Tex. Com.App.) 5 S.W.(2d) 754, at page 756.

"The enunciated rule is founded on that principle of right and justice which estops a party from escaping liability where he has caused another to lose some right or vantage ground by his acts, words, or conduct." Milmo Nat. Bank v. Cobbs, 53 Tex. Civ.App. 1, 115 S.W. 345, at page 348.

"An estoppel to deny corporate existence may arise, not only from dealing with or from other recognition of a corporation,

as shown in the preceding sections, but also from the holding out of an association as a corporation or participation therein, and such an estoppel may operate either against the association or pretended corporation, or against the individual promoters, stockholders, or members, or persons who have acted as directors, officers, or agents of the pretended corporation, and thus participated in holding it out as a legal corporation. * * *

Persons who, as promoters, stockholders, or officers of a pretended corporation, have been at fault in failing to comply with the law in its organization, are clearly estopped, both as creditors and otherwise, to deny the legal existence of the corporation and thus to take advantage of their own wrong. And promoters, stockholders or members, and directors or other officers or agents of a corporation, who have participated either in its organization or in holding it out as a legally existing corporation will be individually estopped to deny its corporate existence as against the corporation itself, or its receiver, assignee, or successor, or as against third persons who deal with it as a corporation. * * *

"By participating in the organization of an alleged corporation or in recognizing and holding it out as a legal corporation, stockholders or members are individually estopped to deny its corporate existence, not only as against persons who have dealt with it, but also as against the corporation itself or its receiver or assignee." 14 C.J. pp. 235–237.

"A corporation sued on a contract made by it will not be heard to say that its charter had expired by limitation when the contract was made. And the same rule has been applied in suits by stockholders to set aside corporate contracts, or to recover damages for a sale of corporate property in fraud of the corporation." 8 Fletcher's Cyc. of Corp. p. 319.

"When an association of persons assume a name, which implies a corporate body, and exercise corporate powers, they should not be heard to deny that they are a corporation. When they do act and contract they are estopped from denying their corporate liability." U. S. Express Co. v. Bedbury, 34 Ill. 459.

"Estoppel by contract is not, strictly speaking, an estoppel in pais, because it lacks several of the essential elements of an estoppel in pais but is regarded merely a form of quasi estoppel based on the idea that a party to a contract will not be permitted to take a position inconsistent with its provisions, to the prejudice of another. * * *

"A person will not be permitted to accept the beneficial part of a transaction and repudiate the disadvantageous part." 17 Tex.Jur. pp. 129, 130, 135.

See, also, Bunn v. City of Laredo (Tex. Civ.App.) 213 S.W. 320; Burnett v. Atteberry, 105 Tex. 119, 145 S.W. 582, 587; Ferguson Fruit & Land Co. v. Goodding, 44 Idaho, 76, 258 P. 557; Kraus v. A. H. & D. H. Morris (Tex.Civ.App.) 245 S.W. 450, 451; 28 Tex.Jur. 246.

The appellees rely strongly upon Judge Phillips' opinion in the case of Davis v. Allison, 109 Tex. 440, 211 S.W. 980, 984. This case, and its contemporary, Thompson v. First State Bank, 109 Tex. 419, 211 S.W. 977, 978, are both, in our opinion, against appellees. We quote from these in the order named:

"Persons dealing with a corporation are not charged with knowledge of the facts, but they are chargeable with knowledge of the law. * * *

"Here, the reputed corporation was prohibited by the Constitution. It was wholly without power to issue any stock. Creditors were not warranted in giving any faith to the subscriptions. They were bound to know that the subscriptions were not enforceable, and therefore could not have been misled by them. Nor is the case to be confused with those where the corporation is illegally organized, which defense, it is generally held, stockholders are estopped to assert against creditors. Those cases deal with corporations which may legally exist and which may exercise lawful powers, not with prohibited corporations which can possess no corporate powers."

"All men are charged with knowledge of the law, but they are not charged with knowledge of the facts. We are not dealing here with a prohibited corporation— one which could not, under the law, exist, and hence without power to issue stock. * * *

"What made the stock invalid was not the bank's want of power—a thing governed by the law, but the manner in which the power was exercised—a thing determined by the facts. Persons dealing with a corporation, while chargeable with knowledge of its powers, are not bound to

take notice of the manner in which it has attempted to exercise its powers. Kampman v. Tarver, 87 Tex. 491, 29 S.W. 768. This is because its powers rest in the law, while the manner of the exercise of its powers rests in the facts. With the bank possessed of the power to issue the stock, creditors without fault would have the right to assume that it was issued in a lawful manner. They would not be chargeable with notice of the facts which made the manner of its issuance unlawful. With this true, the estoppel which equity creates in their favor cannot be defeated by the fact that the transaction was, as between the parties, invalid. In all such cases equity refuses to permit the stockholder in default to plead his own wrong as a means of defeating his just obligation. As a matter of good conscience he should not be heard to plead it. In such situations equity is concerned in the stockholder's doing what he ought to do, rather than in his having done what he ought not to have done. It therefore holds him estopped, and properly so."

 Here it sufficiently appears that appellants had no personal knowledge prior to the institution of this suit of the quoted action of the Arizona Corporation Commission. That such acts of a nonresident body could not constitute constructive notice, is, we think, apparent. The same lack of actual or constructive notice applies also to the Wards with whom appellants were in privity. The appellees were in·position to know whether they had paid the statutory charges in Arizona, as well as whether or not said corporation had been dissolved. Indeed, the statute of Arizona already quoted requires notice, as therein pointed out. Whether proper payments had been made to keep said corporation alive, and whether or not a foreign corporation was actually alive, were both questions of fact, not law, concerning which appellees were in much better position to know than appellants.

We are of the opinion that an issue existed as to estoppel, that same was highly material, and that it was the statutory right of appellants to have a finding on same. Goode v. Lowery, 70 Tex. 150, 8 S.W. 73, 75; Holloway v. J. H. Mitchell Cotton Co. (Tex.Civ.App.) 67 S.W.(2d) 398; Bolding v. Porter & Billingsley (Tex. Civ.App.) 55 S.W.(2d) 206.

 Tied to the question discussed is the authority of Schwind, which appellants

claim was conclusively proven, citing pages of the record. We copy a portion from two of the cited pages, a sample of what the record shows:

"Q. You don't mean to tell this Court you were acting there without the knowledge and consent of your wife and daughter to your disposing of all properties, transacting the business of their company without their knowledge and consent? A. I think there was very little of·the property disposed of.

"Q. But the acts you did do on behalf of the company were with the authority and approval of your wife and daughter, weren't they, Mr. Schwind? A. There never was any objection.

"Q. Answer my question, Mr. Schwind, yes or no, please. A. There was never no objection.

"Q. And they knew you were conducting the business of the company in their behalf, didn't they? A. They knew I was president of the company. * * *

"Q. You had full authority from the time—did you have full authority from them to do any and all things that you felt necessary or proper to do for the company from the time it was first incorporated up until June 28, 1927? A. I assumed the authority to do anything that I did. * * *

"Q. You didn't mean to do it without the knowledge of your wife and daughter, did you? A. I never had any particular thought about the matter, however, did what I thought was the proper thing to do.

"Q. You knew in your own mind, didn't you, Mr. Schwind, all the time that you had the full authority of your wife and daughter to do what you were doing?"

The last question is followed by three pages of wrangling between counsel, solemnly incorporated as "facts," with an adverse ruling apparently by the court. We do not think it is our duty or that it is fair to this court to ask us to fish out of a whirlpool of bickering for evidence to sustain a claim that the evidence conclusively establishes a claim of a litigant. There are four large volumes of so-called evidence in this case. Quotations from same are meager. References are mainly to pages, a sample of which appears above. Based mainly upon the unchallenged statements in the briefs of parties, it clearly appears, at least as an issue, that Schwind

had authority from appellees to do and perform the acts already. mentioned.

Incidentally, we say in passing, that if the corporation had been dissolved and Schwind had such authority from appellants as made the extension contract theirs in truth and fact, what difference could it make whose name he signed to same, provided, of course, it be established that it was their contract?

The above purchase-money note was transferred by the heirs of Lafayette Ward, its then owners, to appellants, who foreclosed and bought the land in controversy as above stated. Appellees contend, and the trial court apparently found, that no title passed to appellants by said sale. This in the main is apparently based upon two contentions: First, that there was no consideration for the transfer of said note, and, second, that under the parol purchase agreement, the Wards were part owners of said note, so that it required a request from them for the trustee to legally act, in the absence of which his sale was void.

At the time of the alleged purchase of the note, the land herein had been sold to appellants at a tax sale. In view of the amount of taxes against it and the condition of the title, the land was practically worthless, and therefore the note had very little value, Schwind, its indorser, being insolvent, and the security worth little above the then liens against it. It appears that one of the Wards was to receive a credit of $500 on an indebtedness owing by him to appellants. The primary purpose of the transfer of said note was to enable appellants to perfect their title by foreclosure and to secure possession. After this was done, if anything remained in the way of a deficiency judgment, or balance on the note, same was to be retransferred to the Wards.

One of the Wards, a witness for appellees, explained the transaction in part as follows:

"Q. What did you believe in your mind, why you did it? * * * A. Well, my reason was to help the Mauritzs clear title, tax title to land that we couldn't protect and at the same time, viewed the matter, it would be a pick-up for my brother to that extent, they were to credit an obligation that he owed them, figured that was all the value that it had, had no further value. It, that note though was to be returned to us.

"Q. When? A. When the land, when the title was cleared.

"Q. That the note would finally— A. The note was finally to come back to us.

"Q. That was your understanding? A. Yes, sir. * * * Transferred the note to Mauritz Brothers, they wanted it because they bought this land at a tax sale and that was the method of foreclosing under that deed of trust or note and giving them clear title to it, rather that is the way I understand it. * * *

"Q. What were they to do with the note after they had gotten possession of the property? A. After they got clear title to the land they were either to transfer the note, balance of the note, back to us or the balance of the judgment, whichever the case might be, after they got a clear title to the land.

"Q. They were using it then to get clear title to the land, as I understand? A. Yes, sir.

"Q. And then to transfer the note back? A. The residue of the note.

"Q. Or the residue of the judgment? A. Yes, sir.

"Q. Or else whatever judgment they got? A. Or else whatever judgment they got."

One of the appellants testified in part:

"Q. All right, Mr. Mauritz, isn't it true that at the time this assignment was made to you that it was never intended that the title of the note should be passed to you? A. No, sir, that is not true. * * * It is true that we wanted the note and the lien in order that we might through it get immediate possession.

"Q. Then you did not buy the note outright, did you? A. Yes, sir. * * * When I bought the note from Laffie Ward, I believe after we had come to an agreement as to what we were to pay him for it, he asked that after we had foreclosed on the land that if we should get the benefit of a deficiency judgment against Mr. Schwind that we would assign and transfer this judgment to Laffie's wife and Alfred's wife."

We do not pause here to discuss the contention of the appellants that the above and other testimony of like character varied the terms by parol testimony of their written assignment.

Giving to same its full effect, it conclusively appears that full legal title to

said note was intended to be passed and did pass to appellants for the purpose of a foreclosure suit, and that as to such matter, the Wards had no control over or interest in it.

We again quote:

"An instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof. If payable to bearer it is negotiated by delivery; if payable to order it is negotiated by the indorsement of the holder completed by delivery." R.S. 1925, art. 5934, § 30.

" 'Holder' means the payee or indorsee of a bill or note, who is in possession of it, or the bearer thereof." R.S.1925, art. 5948, § 191.

"The holder of a negotiable instrument may sue thereon in his own name and payment to him in due course discharges the instrument." R.S.1925, art. 5935, § 51.

While appellants purchased this note after maturity, and are not "holders in due course," in the sense that they could plead innocent purchaser, they were, we think, a "holder" under the above facts, in the sense that they might sue or foreclose on the security, without the joinder of or any action by the Wards.

■ We again quote:

"The mere naked fact of the plaintiff not being the real owner of the note, would not be matter of defense, either in bar, or in abatement. It not unfrequently happens in the course of business, that a suit at law is brought by the legal holder, when the interest is in another; and this practice is not repugnant to the rules of law. * * *

"The true and real owner of the note sued on in the case under consideration, could not have been a material enquiry. The note itself showed the right of the plaintiff to sue at law; and the enquiry whether there was an equitable owner, aside from or behind the legal ownership, was not essential to the rights of the defendant, unless there was matter of defense growing up between him and such equitable owner. The judgment against him would be a complete bar to another action, on the same note. The enquiry, who was the real owner, could only have been a matter of idle curiosity." Thompson v. Cartwright, 1 Tex. 87, 46 Am.Dec. 95.

"It cannot be questioned that the assignment of the note by the payee, passed to the plaintiff, as assignee, the legal title, * * * and that the party in whom is the legal title may sue, though the equitable ownership be in another, has long been a settled question in this Court. * * * It is wholly immaterial to the plaintiffs' right of action in this case, in whom may reside the equitable ownership of the note; and surely that is a question in which the plaintiffs in error can have no interest." De Cordova v. Atchison, 13 Tex. 372.

"It has long been well settled that one who has the legal title to a note may sue in his own name, though the equitable title be in another, unless the defendant have a defense against one which he could not urge against the other. No such condition existed in the instant case." Houston Finance Corp. v. Stewart (Tex.Civ.App.) 7 S.W.(2d) 644, 646.

"It is a general rule, applicable to all written contracts, that he who has the legal title may maintain an action upon it notwithstanding another may have the equitable right to the proceeds of it when collected." Phoenix Assurance Co. v. Allison, 87 Tex. 593, 30 S.W. 547, 548.

■ In this case the implied consent of the Wards to a summary foreclosure at trustee's sale was given when the note in question was purchased. Why should appellants go back to them for a consent they already had? Would any judicial mind doubt that the lips of the Wards were closed by their contract with appellants? Could they raise the question now raised by appellees? We think not. Then what right have appellees to raise even the question of consideration? The consideration for the assignment of the note was the cancellation of a pre-existing indebtedness. This was sufficient. Greneaux v. Wheeler, 6 Tex. 515; Steere v. Stockyards Nat. Bank (Tex.Civ.App.) 266 S.W. 531, 537 (writ ref.), and authorities there cited. The regularity of the trustee's sale, other than above, is not questioned.

We think the court erred in finding in effect that no title to said note passed to appellants, and that the trustee's sale was void.

The appellees claim the note was unenforceable for still another reason, which sufficiently appears in the following findings of the trial court:

"At the time of making said note, there was an outstanding indebtedness owing by the Valley Fruit Farm and Garden Com-

pany to Lafayette Ward equal to the amount of the note above referred to, and there was a great deal of dissatisfaction among the colonists or purchasers of the tracts of land out of the larger tracts, for which the note above referred to represented the balance of the purchase price. And, at·the time of the execution of the note, October 31st, 1919, it was agreed between William F. Schwind, acting for the Valley Fruit Farm and Garden Company, and Lafayette Ward, that the Valley Fruit Farm and Garden Company would execute such note, but there was an express understanding that the said· Lafayette Ward would never demand the full payment of said note, unless conditions improved· and the land securing the payment of said note enhanced in value sufficient to justify payment of said note.

"That said transaction and agreement was made as well to accommodate the said Lafayette Ward, as to accommodate the maker of said note, and it was further agreed that the said Lafayette Ward could and would and intended to use said note as an asset in his hands, for the purpose of enabling him, if he saw fit to do so, to use same as collateral in borrowing money or in securing indebtedness then owing, and it was further agreed, at the time of the execution of said note, that said land would not be encumbered with an enforcible lien as between them, viz., said Ward and Valley Fruit Farm and Garden Company, beyond any amount owing by said Ward, and which said loan had been specifically secured in its payment by a pledge of said note by Ward."

 The above finding follows almost literally the language of appellees' first amended original answer. Appellees later by a trial amendment pleaded a conditional delivery of the note in question, but the case was disposed of upon the theory of the defense pleaded originally. We will not therefore turn aside to discuss, in reply to appellees' argument, the defense of conditional delivery, a theory apparently ignored by the trial court.

The note and deed of trust are in legal effect one instrument. They were delivered together to Ward, the payee, and are complete and unambiguous writings in the usual form of such instruments. By parol evidence they were each varied and contradicted, and such oral testimony was manifestly made the basis in part of the trial court's judgment.

This subject has been the prolific source of so much discussion that we content ourselves with a brief quotation from authorities.

 Judge Phillips' language in Holt v. Gordon, 107 Tex. 137, 174 S.W. 1097:

"It is our opinion that the Court of , Civil Appeals correctly ruled the evidence to be inadmissible. It may be shown by parol testimony that an ordinary written instrument was executed under an agreement that it was not to become effective except upon certain conditions. Loving v. Dixon, 56 Tex. 75; Burke v. Dulaney, 153 U.S. 228, 14 S.Ct. 816, 38 L.Ed. 698; Blewitt v. Boorum, 142 N.Y. 357, 37 N.E. 119, 40 Am.St.Rep. 600; Merchants' National Bank v. McAnulty (Tex.Civ.App.) 31 S.W. 1091. But that principle has never been recognized by this court as applicable to a deed to land, *or a deed of trust* affecting the land, where the delivery of the instrument was made to the grantee, and not to a third person. It has, upon the contrary, been distinctly held that a deed or *deed of trust* cannot be an escrow where it is delivered to the grantee in the instrument." (Italics ours.)

"A parol condition affecting the payment of a delivered instrument is not enforceable if it operates to add to, take from or vary the terms of the writing. Oral evidence is inadmissible to vary an unconditional promise to pay money by showing a prior or contemporaneous parol agreement that the promisor should not be required to pay or that it was not absolutely payable as, for example, that it should be payable only upon the performance of a specified condition or the happening of a certain contingency, or that payment should be made out of a particular fund. Nor is it permissible to show an oral agreement reducing the amount stipulated to be paid, as, for example, an agreement that a less sum is to be paid upon a certain contingency, or providing for a remission or rebate of a portion of the principal or interest. * * *

"Evidence is inadmissible to establish a prior or contemporaneous oral agreement which qualifies or varies definite dates of payment which have been fixed by the instrument—as, for example, an agreement that payment may be made after the date specified or postponed upon the .happening of a named contingency." . 17 Tex.Jur. pp. 844–846, and numerous authorities cited.

■ It is our opinion the trial court erred in giving legal effect in said findings to the parol agreements, which contradicted and varied the terms of the note and trust deed. 17 Tex.Jur. p. 793.

When the extension agreement above mentioned was delivered, appellees claim that it was with the understanding and upon the condition that it came within the agreements already set out and discussed above. The sole evidence of such was a carbon copy of an alleged letter written by Schwind to Ward. Respecting this the court found: "The contract of extension was delivered on November 1, 1928, and along with such contract of extension was delivered the letter of Schwind to Ward, and such letter was delivered with such purported contract and as a part of it and as a condition upon which the delivery was made, which condition was and the agreement and understanding was, that such extension was to come within the terms and agreements as hereinabove set out in Paragraph XIII, entered into between the Valley Fruit Farm and Garden Company and William F. Schwind, and Lafayette Ward, at the time of the execution of the note."

■ The introduction of the letter was over the objection of appellants. There was no attempt made, as a predicate for its introduction, to account for the original. No notice to produce the original was given, nor any showing made that it could not be produced. The carbon copy tended to support the court's finding. That it was secondary evidence and inadmissible is too plain for discussion.

■ Nor was it made admissible by a question propounded by appellants' counsel respecting the existence of any writing to evidence the alleged agreement. Such question evidently did not refer to the contents of a carbon copy, which could have been prepared after the question was asked. We make the latter statement only as one reason for the rule excluding such, and not as an intimation that it actually occurred. The authorities sustain appellants. McDonald v. Hanks, 52 Tex.Civ.App. 140, 113 S.W. 604, 607; Ricker National Bank v. Brown (Tex.Civ.App.) 43 S.W. 909; 3 Tex.Jur. pp. 1031, 1032; 17 Tex.Jur. pp. 481, 484, 485, 486, 487, 488; 22 C.J. 1021.

Without this letter, the above finding was wholly without evidence to support it.

■ Though perhaps unnecessary, in deference to the earnest argument of both parties, we pass upon the claimed invalidity of the tax judgments because service was not upon the real owners of the land in question. As stated above, the service was upon the "Company" and "all persons owning or having or claiming any interest," etc., under article 7342. If the Company were legally dead, the title was in the above appellees as sole members of a dissolved corporation. The statute provides for suits against such as follows:

"Where property in this State has been granted or has accrued to the heirs as such, of any deceased person, or to the stockholders of defunct corporation, any party having a claim or cause of action against them relative to such property, if their names be unknown to him, may bring an action against them, their heirs or legal representatives, describing them as the heirs of such named ancestor or unknown stockholder of such corporation. If the plaintiff, his agent, or attorney, shall make oath that the names of such heirs or stockholders are unknown to the affiant, the clerk shall issue a citation for such heirs or stockholders, addressed to the sheriff or any constable of the county in which such suit is pending." Article 2040, R.S.

Article 7328, R.S., as amended by Acts 1927, 1st Called Sess., c. 99, § 1 (Vernon's Ann.Civ.St. art. 7328) respecting tax suits is in part as follows:

"The proper persons, including all record lien holders, shall be made parties defendant in such suit, and shall be served with process and other proceedings had therein as provided by law in ordinary foreclosure suits in the district courts of this state."

We are of the opinion that article 2040, supra, furnishes the procedure in a case where it becomes necessary to sue the unknown stockholders of a defunct corporation for taxes and to foreclose the tax lien. The question may not again arise and we pretermit further discussion of it. Cases believed analogous: Underwood et al. v. Pigman et al. (Tex.Com.App.) 32 S. W.(2d) 1102; Griggs et al. v. Montgomery, et al. (Tex.Civ.App.) 22 S.W.(2d) 688.

A discussion of other questions would in the main amount only in effect to a pronouncement of what we would hold if different and other facts were present.

Judgment reversed and cause remanded.