## No. 2506.

### HARGADENE, MCKITTRICK & COMPANY *v.* JAMES B. WHITFIELD.

1. HOMESTEAD.—The homestead right when fixed is an estate in the land. The creditor has no right in it nor to it as a security.
2. PLACE OF BUSINESS.—The owner of a resident homestead and a place of business may properly enlarge the building occupied by him in his business; such enlargement is exempt from forced sale.
3. SAME—OTHER USE.—The erection of a building adjoining a business house for the purpose of being leased to tenants is a designation of such addition to the other uses inconsistent with its exemption as the place of business.
4. MERCHANT FAILING.—A merchant failing in business has a reasonable time for settling up his old and to engage in new business, during which interval the exemption of the place of business is not lost, nor would a change in the business affect the exemption.

5.  CHANGE OF BUSINESS.—The law does not enforce upon the failing debtor
    any degree of success in his new enterprise if it be a bona fide busi-
    ness conducted at the former place of business, as a condition to its
    protection.
6.  USE OF PREMISES.—The use determines the place of business as also
    the dedication to other purposes. (66 Texas, 1; 57 Texas, 674; 59
    Texas, 39; 42 Texas, 201.)
7.  VALUE OF HOMESTEAD.—That a homestead exceeded the prescribed
    value does not prevent the premises becoming a homestead, nor sub-
    ject the whole to sale.
8.  EXCESS IN VALUE OF HOMESTEAD.—In absence of pleadings raising
    the issue, the right of a creditor to any excess would not be determ-
    ined.
9.  FACT CASE.—See case where it is held that a part of a lot was dedicated
    to other purposes than a place of business and thereby become liable
    to attachment.

APPEAL from Red River.   Tried below before the Hon. E. D.
McClellan.

Appellants brought suit by attachment against appellee, and
on the nineteenth day of January, 1888, at eleven o'clock a. m.,
had their writ of attachment levied upon lands of the defend-
ant, and, among other lands, levied upon lots eleven and twelve,
block 3, in the town of Detroit, Red River county, Texas.

Appellee answered by plea in abatement to the levy of the
attachment as to said lots eleven and twelve; alleged that he
was a citizen of Texas, head of a family, a merchant; also
bought cotton and sold some goods on commission; alleged and
claimed that lots eleven and twelve constituted his business
homestead, were exempt from levy and sale under the Constitu-
tion and laws of Texas, and prayed that the levy of the writ
of attachment as to said lots be abated.

Appellants by supplemental petition alleged that there were
at the date of the levy of attachment two brick houses on lots
eleven and twelve; that up to a short time before the levy, ap-
pellee was engaged in the business of general merchandise,
and used and occupied one of these houses as his place of bus-
iness; that the other house, at the time of the levy, was used
and occupied by another party for another separate and dis-
tinct business, and was not used by appellee for a place of bus-
iness at all; that just before the levy of the writ of attachment
the appellee voluntarily ceased to do business in his former
place of business, and conveyed and turned over his entire

stock of goods and merchandise situated therein to another party, and thereupon ceased to do business and abandoned his said place of business, and the same then became liable to levy and sale for his debts, and that after he had so abandoned his place of business the attachment was levied.

Appellee admitted the appellants' claim, that they were entitled to a judgment for the amount of their debt, and foreclosing their attachment lien on all the property levied on except lots eleven and twelve; and upon his plea in abatement to the levy upon said lots assumed the burden of proof and claimed the right to open and conclude, which was granted by the court.

The testimony was as follows:

Whitfield, the appellee, testified: "I am a citizen of Texas, reside in Detroit, Red River county, Texas. I am the head of a family, and have been for ten years. Was raised in Texas. Commenced business in Detroit in 1877. Cuntinued in business up to January 17, 1888; general merchandise. Also bought cotton and sold some goods on commission. I turned over all my stock of general merchandise to W. J. McDonald on seventeenth or eighteenth of January, 1888. The goods still belong to me. He is selling them for my benefit to pay my debts. I have never abandoned my place of business. I still keep my office there on lots eleven and twelve. I keep my desk and my safe in there, and my notes and accounts. I keep my cotton samples and cotton books there. I bought cotton both before and since I turned over my stock of goods to McDonald. I have been buying cotton there every season while I have been doing business there. I have a residence homestead in Detroit, some two hundred or three hundred yards from my place of business. I built and occupied it some six or eight years ago. My business house I built some three or four years ago. I owed about forty-four thousand dollars at the time I turned over my stock. The stock invoiced about twenty thousand dollars. My lands outside of my homestead were valued at about four thousand five hundred dollars. I also had notes and accounts outstanding to amount of about thirty thousand dollars. The day after I turned over my stock to McDonald I offered fifty cents on the dollar to my creditors, and called a meeting of my creditors at Paris on February 1, expecting to make the same proposition there. There were very few creditors at the meeting, and some had attached in the mean time,

and therefore no proposition was then made. But I informed my creditors that I would make them a proposition as soon as I saw my way through. I did make them a proposition in April, offering thirty-three and one-third cents on the dollar. I am able to carry out my proposition if accepted. I expect to be able to resume business again. The proposition for a settlement is still pending."

This is a map of lots eleven and twelve:

On cross examination: "Detroit has about three or four hundred inhabitants; is not an incorporated town; is a station on the Texas & Pacific Railroad, in Red River county. My residence is on the north of the railroad; my place of business is south of the railroad; they are two or three hundred yards apart, and not connected. There are two brick houses on lots eleven and twelve, and were at the time of the levy. The west house was built about a year before the other. The lots are each twenty-five feet front and one hundred and fifteen feet in length. I built the west house, thirty by one hundred feet, running over five feet on lot eleven, and moved into it and opened out my business. My sign is over the front of the house, and is: "J. B. Whitfield, General Merchandise." About one year after I had built this house I extended it back fifteen feet further, also built the east house, which is twenty feet wide and extending the full length of the lot. The origi-

nal east and south walls of the first building constituted the partition walls between the two houses. Sixty feet from the front of the east house, I ran a plank partition and used the back part of the east house and the fifteen feet extension of the west house for a wareroom in connection with my store in the next house. The front part of the east house, twenty by sixty feet, I rented out. I never occupied or used this front part of the building on the east lot. It has been rented ever since it was built—first for a drug store and then for dry goods and groceries. Norwood & Co. were carrying on business in it at the time of the levy, and are yet (May 31, 1888), and had been for about a year before. Their business had no connection with mine. There was no door between the store room and my place of business. I did not buy cotton on orders, * * but bought it and sold it whenever I could. I sold to spinners sometimes, and sometimes to other buyers. I kept my cotton business separate from my other business—did not trade goods for cotton, but always paid cash for it. If I had an account against a party from whom I bought, I of course kept out the account. I think all country merchants buy cotton. I bought about one thousand eight hundred last season. * * The goods I was selling on commission were garden seeds and some wagons and other things. The wagons were not in the house; some side boards and bows of the wagons were kept in the house. I had eight or ten wagons and one of those ordinary boxes of garden seeds to sell on commission. Some of those commission goods are on hand yet. All merchants sell these garden seeds on commission. I don't think it would be necessary to have both of these houses to sell the garden seeds and wagons in. I don't think it would be necessary to have both to carry on my cotton business. I kept my cotton samples and books and desk in the back part of the west building. The front part of the west building was shelved and countered and had my goods in it. My goods, turned over to McDonald, will bring about thirteen thousand dollars. The land upon which I gave a deed of trust will bring about four thousand dollars.

The bulk of my notes and accounts are not collectable by law. It is country paper, and not considered good. I did not transfer my notes and accounts to McDonald with my stock of goods. I executed two instruments to McDonald—one a chattel mortgage with possession, and the other a deed of trust on lands. These were executed at same time, at Paris, January

17, 1888.. Paris is eighteen miles west of Detroit. H. D. Mc-Donald, W. J. McDonald (the trustee) and myself came from Paris to Detroit on eighteenth of January; got to Detroit about 10 a. m. Myself and W. J. McDonald got off and went imme-diately to my place of business, and I then and there turned over to him all my stock of merchandise of every description, and he took possession of the same. I turned over the business house to him with the keys. I have never had possession of my goods since. McDonald, by his clerks and employes, has been in possession of the house and stock ever since. He pays me no rent. I have access to my books and papers in the building.

I did convey and include in the deed of trust to McDonald lots eleven and twelve, but I did not want to do it. I told H. D. McDonald at the time that I claimed them as my home-stead. He said that there might be some question about it, and that I had better put them in. H. D. McDonald came on to Clarksville, on same train with us, to file mortgage and deed of trust. All my property except my residence home-stead, furniture and notes and accounts were. included in the mortgage and deed of trust.

I am not able and can not pay my creditors in full. I can not resume business unless I can get a settlement with my creditors. Some have accepted, but the most of my creditors have refused. All attaching creditors have refused."

The chattel mortgage and the deed of trust spoken of were in evidence, and each included a list of creditors. Some were to be paid in full.

The findings of the court attacked are as follows:

"4. That defendant was a citizen of Texas, a married man and head of a family, and occupied and used all of said buil-ding (those on lots eleven and twelve) as his business home-stead, except the twenty by sixty feet above mentioned, which he had never so used, but rented to other parties, and which was occupied by other parties at the time of levy. That the addition (except the twenty by sixty feet) was used only as a ware room.

"5. That defendant had a residence homestead in the same town; and that all the lots used and occupied by him as a resi-dence and business homestead did not exceed five thousand dollars in value at the time of their designation as such home-stead."

"7. That said lots eleven and twelve had not been abandoned by defendant as a homestead at the time of the levy of the attachment, but as matter of fact were his business homestead."

As conclusion of law, the court found "that the whole of lots eleven and twelve constituted, at the time of the levy, the business homestead of the defendant."

The errors assigned attacked these findings and the judgment abating the attachment as to the lots eleven and twelve, urging that it devolved upon the claimant to prove that the residence and business homesteads together did not exceed five thousand dollars in value. That the use of the rear part of the new building, mostly on lot number eleven, never had constituted it a part of the business homestead; that defendant ceased business January 18, 1888, and had not resumed, nor had any prospect of doing so; that by assigning and turning over possession to the trustee, he had abandoned the lots and buildings as a place of business.

*Dudley & Moore,* for appellant, cited Shryock v. Latimer, 57 Texas, 674; Bowman v. Watson, 66 Texas, 295; Scheuber v. Ballew, 64 Texas, 166; Gassaway v. White, 70 Texas, 475.

*H. D. McDonald,* for appellee: The facts existing at the time of the levy can alone be looked to to determine the rights of the parties. (Ingle v. Lea, 70 Texas, 509.)

The whole of lots eleven and twelve constituted, at the time of the levy, the business homestead of the defendant, and the judgment of the court based thereon abating appellants' levy was correct. (Shryock v. Rowland, 57 Texas, 614; Scheuber v. Ballew, 64 Texas, 168; Inge v. Cain, 65 Texas, 75; Wynne v. Hudson, 66 Texas, 8; Bowman v. Watson, 66 Texas, 295; Tillman v. Brown, 64 Texas, 181; Archibald v. Jacobs, 6 S. W. Rep., No. 3, 177; Gassaway v. White, 70 Texas, 575; King v. Harter, 70 Texas, 579.)

WALKER, ASSOCIATE JUSTICE. The questions raised in this case are not novel. The homestead right when fixed is an estate in the land—it is more than a mere privilege of occupancy. The land on which the estate has been fixed is exempt from execution, nor can it be a subject of mortgage by its owner. The creditor has no rights in it nor to it as a security;

nor is he defrauded by the debtor holding it or by any dispo-
sition he may make of it.

The inquiry therefore in this case is as to the *status* of the
property in controversy at the date of the seizure by the
sheriff. Was it the place of business of appellee at the date
of the levy of the attachment? (Ingle v. Lea, 70 Texas, 509.)

There is no dispute as to the fact that prior to January 18,
1888, the main store house thirty by one hundred feet first
built by Whitfield was occupied as his place of business. The
part of the two lots eleven and twelve not covered by the
store house, by a liberal construction of the term "place for
the exercise of the calling or business," might, by reason of
actual occupancy of parts of both lots, be covered by the ex-
emption in absence of any other fact giving such a part any
other character of property. The extension by Whitfield of
his store room and its occupancy as a ware house in his busi-
ness was legitimate. It was not a ware house detached from
and no part of the lot used as his place of business, as in Mc-
Donald v. Campbell, 57 Texas, 617. If the extension was made
for his business its exemption of course would not be affected.

In the renting out of the twenty by sixty feet of the north
end of the new building is evidence of a designation to another
use inconsistent with his own. Such acts have been held as
an abandonment to that extent even of a part of the residence
homestead. (Wynne v. Hudson, 66 Texas, 1.)

The mere failure in business of Whitfield as a merchant did
not work an abandonment of such part of said lots as were
his place of business. Nor did his assignment have that effect.
The work of disposing of the merchandise by the trustee was
a winding up of that part of his business and did not prevent
his continuing in some other business or in resuming as a mer-
chant should he ever be able. He had a reasonable time
within which to begin business of some kind. He could have
changed his calling voluntarily. The compulsory change of
itself would not destroy his right to labor upon the place of his
disaster in some other or new occupation. (Gassaway v. White,
70 Texas, 509.)

The law does not as a condition for its protection of these
rights impose upon the failing debtor any definite degree of
success in his new enterprise. The intent of the exemption
seem to be to aid those needing it rather than those in prosper-
ity. It is useful only in financial distress.

There is ample testimony to Whitfield's efforts to do something for himself. He looked after his notes and accounts kept in his store room to which had access for the purpose. He sold garden seeds on commission as other merchants did. He sold wagons on commission, using the ware house in storing parts of the wagons. He bought and sold cotton, keeping his cotton samples and books in the house. He testified that he had hopes of resuming as a merchant. It is evident that Whitfield needed and used a place of business. That his business was comparatively small is not to be considered when he invokes the shelter of the law over what little he had. It can not be held that the law withdraws its protection from "small beginnings."

The use determines the place of business. The dedication to other purposes is inferred by the erection of the building and its continued letting to tenants—a use inconsistent with his own. (66 Texas, 1, Wynne v. Hudson; 57 Texas, 674, Shryock v. Latimer; 59 Texas, 39, Medlinka v. Downing; Iken v. Olenick, 42 Texas, 201.) Such was the use of the twenty by sixty feet in the north end of the new building.

The court in its findings fixes the value of the homestead property, resident and business, to be less than five thousand dollars. There is no testimony to value in the statement of facts. In the absence of the testimony the court can not presume the value at any particular sum. Certainly it will not be presumed that it was over five thousand dollars in value. But this was not in issue in the pleadings. The lots eleven and twelve were claimed as exempt as the place of business to which he was entitled as head of a family.

The appellants, after a general denial, attacked the claim, alleging abandonment of it by Whitfield, etc. That the homestead exceeded in value the constitutional limit did not subject the whole to sale. In rural homestead the statute provides for setting apart the homestead where the acres in the tract or tracts claimed are in excess.

It is not doubted but the excess in value in the urban homestead can be subjected to the payment of debts. But to do so the pleadings should be so formed as to put the fact in issue. The claimant should have his interest preserved. The court is as much charged with the duty of protecting the amount of interest had by the debtor and allowed by the Constitution as in cutting off the excess for the creditor.

The purpose of the statute is to protect *the homestead.* The quantity and value are limitations upon it when established. They form no part of a definition of a homestead. If the value exceeds the limitation it does not destroy the homestead or make it any the less one. Our courts have indicated in other cases as a means of subjecting the excess, the sale of the property and the appropriation of the excess to the payment of the debts. (Paschal v. Cushman, 26 Texas, 74.) In other States, under statutes allowing it, a partition has been decreed where possible, and setting apart of the homestead the value allowed to the occupant, the residue to be subject to sale. (Gregg v. Bostwick, 33 Cal., 222; Thompson on Homesteads, secs. 110, 111.)

The general denial interposed by plaintiffs to the homestead claim required proof of the main facts, citizenship, family and residence. The plea in avoidance did not allege the matter of value or ask relief as to any excess. It is held under the findings of facts by the court, which are sustained by the testimony in the record, that the attachment should be abated as to all of lot twelve, and as to all of lot eleven, save as to twenty by sixty feet (being twenty feet in width front and sixty feet back to the partition from the north and east sides of the lot.)

The judgment below should have been so rendered. It is reversed and judgment will be here rendered in accordance with this opinion.

*Reversed and rendered.*

Opinion delivered October 19, 1888.