MRS. EDNA THOMPSON V. ROY THOMPSON, INDIVIDUALLY
AND AS INDEPENDENT EXECUTOR OF THE ESTATE
OF R. W. THOMPSON, DECEASED.

No. A-2776. Decided January 31, 1951.
Rehearing overruled March 14, 1951.
(236 S. W., 2d Series, 779.)

*Cole, Patterson, Cole & McDaniel, Bennett B. Patterson* and *T. R. Kirchheimer*, all of Houston, *Black & Stayton* and *Chas. L. Black*, of Austin, *M. W. Terrell*, of San Antonio, and *Arch Dawson*, of Wichita Falls, for petitioner Edna Thompson.

The Court of Civil Appeals erred in holding that Mrs. Thompson was not entitled to the 1/8th royalty paid and to be paid under their oil lease, during her life and homestead oc-

cupancy, since the homestead property was producing oil and gas from wells that were open at the date of the death of R. W. Thompson; also in holding that their oil lease operated to divest them of their right of possession in said royalty in such manner as to destroy their homestead interest, and in their construction of the partition order by which they conveyed their interest to the Humble Oil Co., Swayne v. Lone Acre Oil Co., 98 Texas 597, 86 S. W. 740; Davis v. Bond, 138 Texas 206, 158 S. W. 2d 297; Avis v. First National Bank of Wichita, 141 Texas 489, 174 S. W. 2d 255.

*Dan Hruska, C. D. Duncan* and *J. Lee Dittert,* all of Bellville, for Roy Thompson, individually and as executor of the estate of R. W. Thompson, *W. H. Betts,* of Hempstead, for Ethel Thompson Charpiot, and another, Respondents.

MR. JUSTICE GRIFFIN delivered the opinion of the Court.

One R. W. (Robert W.) Thompson, who died October 19, 1948, married the petitioner, Edna Thompson, on October 18, 1916, and these parties lived together as husband and wife until the death of R. W. Thompson. At the time of his marriage he was a widower and had three children by his first marriage, and who are the respondents here (joined by the husbands of the daughters), and who were living in his household at the time of the second marriage. At the time of his marriage, R. W. Thompson owned an undivided one-half interest in the tract involved in this suit, and totaling approximately 334 acres. The son, Roy Thompson, owned the other one-half of said land and lived on said land in a home of his own. Petitioner and R. W. Thompson, immediately upon their marriage, moved into a two-story frame house on the land owned by R. W. Thompson and continued to live in said house and occupy the land as a homestead at all times until the death of R. W. Thompson. Since his death petitioner has continued to occupy this house and land as her homestead down to date of the trial in the lower court. This land was the separate property of R. W. Thompson. R. W. Thompson owned only an undivided one-fourth of all the oil, gas and other minerals in and under his land.

On December 28, 1925, R. W. Thompson, joined by his wife, petitioner herein, executed an "unless" oil and gas and other mineral lease, vesting in the lessee the "exclusive right of mining and drilling for oil, gas, and other minerals, 'as well as such easements over and across the surface of said lands as were necessary for such mining and/or drilling operations, for a cash consideration, and the additional consideration of the

obligation of such lessee to deliver to lessors as royalty one-eighth (1/8), in kind, of such oil as might be produced from said premises by said lessee. Said lands being the separate property of the said R. W. Thompson * * *' "

The Humble Oil & Refining Company became the owner of said lease and brought in a well under said lease shortly after its execution and this land has produced oil and gas continuously for more than 20 years prior to the death of R. W. Thompson, and at the time of his death there were 13 wells producing under said lease and R. W. Thompson had collected pay for the royalties reserved under said lease, and according to his ownership of the land.

On April 1, 1927, R. W. Thompson and wife, Edna, and others joined in the execution of a division order addressed to Humble Oil & Refining Company, and containing the following provisions deemed by us to be pertinent to the points herein discussed:

"The undersignd certify and guarantee that they are the owners of the oil, including royalty interest, produced from wells No. 1 and up on the R. W. Thompson Farm or lease, in Oil Field in Austin County, Texas, which farm or lease is described as follows: * * *

"Until further written notice, you are authorized for your own account, to receive such oil into your own possession or the possession of any person or corporation designated by you. same to be run and measured in accordance with the customary pipe line rules and regulations, including adjustments and deductions provided for by the rules of the Texas Railroad Commission, such oil to be credited as follows: * * *

"The oil run hereunder shall on the terms herein contained become the property of Humble Oil & Refining Company immediately upon being received into the possession of said Company or its designated agent, and said Company agrees to receive and pay for such oil to the respective owners according to the division of interest hereinabove indicated at its posted per barrel (42 gallons) field price for similar crude in the field where received prevailing on the date of such respective run, settlements and payments to be made monthly by check of Humble Oil & Refining Company mailed to the respective parties at the addresses above given.

"Each undersigned hereby warrants and guarantees the title to the oil credited to such undersigned owner according to the

division of interest hereinabove indicated, as well as all interest hereafter acquired and agrees to furnish abstract of title, * * *."

This division order was signed but not acknowledged by any of the signers.

When R. W. Thompson died he left a will, executed on November 26, 1927, appointing Roy Thompson as Independent Executor without bond, and making certain provisions for his wife, Edna, and directed "that all of my just debts be paid out of my estate by my hereinafter named executor as soon after my decease as he may deem necessary and expedient." He gave his interest in the land to his son, Roy, and required Roy to pay his sister, Ethel, (respondent, Mrs. Ethel Charpiot) and his sister, Hazel (respondent, Mrs. Hazel Norman) the sum of $2,000.00 each within one year after testator's death, for their interest in the land. R. W. Thompson's will contained no general residuary clause.

The oil, gas and other minerals were given to his two daughters, Ethel and Hazel, by the Sixth paragraph as follows:

"SIXTH: I give and bequeath unto my said two daughters, Ethel and Hazel, share and share alike, all oil and gas and other minerals, or money or things of value received therefor, that may be found, in under or upon my undivided interest in the lands hereby and herein devised to my said son Roy, and he shall take said land subject to this provision. (Statement of Facts, p. 9.)

The will was probated and Roy duly qualified as Independent Executor. He brought this suit against petitioner, Edna Thompson, and his two sisters, Ethel and Hazel, and their husbands for a construction of the will and a declaratory judgment as to his rights, duties, and obligations under the will with regard to certain portions of the estate.

When the will was probated the petitioner renounced all rights thereunder and gave written notice to the respondents and to Roy Thompson that she would claim nothing under the will of her deceased husband, but that she would stand on her statutory rights and asked that the homestead be set aside to her and that she receive all royalties from the producing oil and gas wells. By admissions, stipulations and the judgments of the trial court and the Court of Civil Appeals all questions have been settled except the contentions discussed below and which we will now take up.

First: It is contended by Hazel and Ethel and their respective husbands (which contention has been sustained in both courts below) that the surviving widow, Edna, is entitled to no part of the oil runs from the 13 wells producing at the time of R. W. Thompson's death and at the time of the trial; because by the execution of the oil and gas lease in 1925 the Thompsons lost their right of possession to all of the oil, gas and other minerals in place, and severed the title to such minerals from the surface estate and passed absolute title thereto to the lessee to such minerals, and therefore, lost all homestead interest therein. It was further contended that by the execution of the division order whereby the Thompsons sold their royalty oil to Humble Oil & Refining Company, they parted with all title to the 1/8th royalty and had only a right to receive the money value of such royalty; that the Thompsons also lost all possessory rights to such royalty and had only a claim on personalty, and therefore, lost all homestead right in such royalty. It was therefore argued that the "open mine" doctrine did not apply to this case, and that the surviving widow had no right to any oil or the proceeds therefrom, but same passed to Ethel and Hazel, under the Sixth paragraph of their father's will, free from any and all claims of the surviving widow, Edna, to the proceeds, or the right to receive the interest from such royalty.

The Court of Civil Appeals in its opinion, (found in 230 S.W. 2d 376), sustained the judgment of the trial court as to the rights of the surviving widow—the petitioner herein—and held she had a homestead interest in the surface of the land, but no interest of any kind or character in the oil royalties from the wells producing on such homestead; but gave these proceeds to the daughters, Ethel and Hazel.

We have carefully read all of the cases cited by the respondents to sustain their contentions as to the oil runs, and in our opinion, not one of them is in point on the proposition that when a husband and wife execute an oil and gas and other mineral lease on homestead lands, they have thereby and thereafter abandoned their homestead rights in the oil and gas and other minerals. We could distinguish each case, verbatim, but to do so would unnecessarily lengthen this opinion. The opinion of the Court of Civil Appeals is directly contrary to the law as laid down by the Supreme Court in the case of Sheffield v. Hogg, 124 Texas 290, 77 S. W. 2d 1021, wherein the authorities are exhaustively reviewed and it is held that the royalty interest under a lease similar to the one involved herein, (as well as

under a lease purporting to be an absolute sale of all minerals to the lessee) is an interest in land, constitutes realty and is taxable to the lessor or other royalty owner. The same contention as to the nature of the royalty payable under the lease was made in that case as is made here. The Galveston Court of Civil Appeals held as they did in this case, and the Supreme Court granted a writ and reversed that court on such theory.

It is true that the Hogg case involved the question as to the taxability of the royalty interest of a lessor, but in order to determine that question it was necessary to determine the nature of the royalty interest, and it was held that such interest was realty and as realty taxable to the lessor, or royalty owner, if the lessor had parted with title to the royalty interest.

The case of Boone v. Bassham, Tex. Civ. App., 51 S. W. 2d 1065 writ refused, was one wherein Boone was seeking specific performance of a contract to convey an undivided one-fourth interest in the oil and gas in a certain 56.6 acre tract of land in Gregg County, Texas. This contract was not signed by Bassham's wife, but by Bassham alone, and the Basshams defended upon the ground that this was a contract to convey a part of their homestead, and the wife not having signed, same was void and not enforceable. The jury found the land was the homestead of the Basshams. Boone made the contention, as here, made, that the husband and wife had abandoned the homestead claim to the oil and gas under the homestead land by virtue of their execution of an oil and gas lease on their homestead, prior to the execution of the contract upon which suit was brought. Judgment was for the defendants in the trial court and on appeal this judgment was affirmed by the Court of Civil Appeals at Texarkana. Judge Willson for that Court said:

"The contention next presented in said brief is that ,if the land ever became the Basshams' homestead, the mineral estate therein ceased to be a part thereof when they leased the land to A. G. Phillips and conveyed an interest therein to R. M. Wood, as shown in the statement above. It is insisted that such lease and conveyance segregated the mineral from the surface estate in the land and presented a situation inconsistent with the continued existence of the mineral estate as homestead, and hence operated as an abandonment of any claim of homestead therein. The contract in question therefore was, appellant insists, valid and enforceable, notwithstanding Bassham's wife did not join him in the execution thereof. We think the contention should be overruled. The lease to Phillips did not pass title to any of the oil and gas not taken from the land, and the

conveyance to Wood was only of an undivided interest, subject to the lease, in oil and gas in and under the land. Certainly, if those instruments should be held to have operated to segregate the part of the mineral estate therein specified from the surface estate, the abandonment thus accomplished should not be held to have extended to the part of said mineral estate not so segregated. That part, we take it, if ever homestead, never ceased to be homestead, and it is that part which, as we understand appellant, he contends was covered by the contract he sought to specifically enforce."

The Supreme Court refused the application of Boone for a writ of error, thereby expressly approving the holding of the Court of Civil Appeals that there had been no abandonment of the homestead by virtue of the execution of the oil and gas lease.

The case of Cates v. Greene, Tex. Civ. App., 114 S. W. 2d 592, no writ of error history, involved a conveyance of an undivided one-half interest in and to the oil and gas under the homestead of Greene and wife to Cates, and the assignment of one-half of the royalties and delay rentals under a lease on the homestead, executed prior to the assignment of the one-half interest to Cates. Such instrument was acknowledged by Cates and wife before a notary, with only a single acknowledgment as both parties, and contained no recitation such as required for the valid acknowledgment of a married woman. In the trial court judgment was rendered cancelling the instrument and awarding the delay rentals to Greene and wife. On appeal the Court of Civil Appeals affirmed the judgment of cancellation, but awarded the delay rentals to Cates. In declaring the law applicable the Court said:

"The property being community, it could be sold by the husband alone, subject to the homestead rights of the wife. Such homestead rights constituted an estate in the property. Woods v. Alvarado State Bank, 118 Tex. 586, 19 S. W. 2d 35. Neither this estate nor any of its incidents could be alienated by the husband alone, nor by the husband and wife jointly, unless the wife should acknowledge the conveyance in the manner prescribed by law. * * *

"It is now adjudicated that such royalties constitute an interest in land, are within the statute of frauds, and cannot be alienated other than by an instrument in writing; and are subject to the registration laws. Sheffield v. Hogg, 124 Tex. 290, 77 S. W. 2d 1021, 80 S. W. 2d 741. Whatever apparent

contrary holdings may have appeared in prior decisions ceased to be authoritative upon the rendition of that decision. The latest expression of the Supreme Court upon this point is in the case of Tennant v. Dunn, 130 Texas 285, 110 S. W. 2d 53, wherein the question was again carefully reviewed. It is true that, after the royalty interest in the oil has been severed from the land, it becomes personal property, but until such severance it constitutes an interest in the realty and is subject to the above rules."

Although this case has no writ history, a reference to the latest edition of Shepard's Southwestern Reporter Citations shows that this case has been followed and its holding on this point never questioned by any court.

In case of Bradley v. Howell, Tex. Civ. App., 126 S. W. 2d 547, writ dismissed, correct judgment, it was held that in order to constitute a valid lease of the oil, gas and other minerals on the homestead the wife must join in the lease, and sign and acknowledge the same as required by law; also that she may change her mind and "back out" of the deal at any time before delivery of the lease, and therefore no suit for specific performance may be maintained as to the homestead.

■ In discussing the nature of a mineral royalty this Court said in the case of Veal v. Thomason, 138 Texas 341, 159 S. W. 2d 472:

"We think it is settled by the decisions of this Court and of this State that a contract affecting land in this State, granting or reserving mineral royalty in such land, constitutes such royalty real property. Stated in another way, a contract affecting land in this State, which grants or reserves mineral royalty in such land, constitutes the owner of such royalty the owner of an estate in such land. Sheffield v. Hogg, (Federal Royalty Co. v. State), 124 Tex. 290, 77 SW 2d 1021, 80 SW 2d 741; Sheppard v. Stanolind Oil & Gas Co., Tex. Civ. App., 125 SW 2d 643, writ refused; W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 SW 2d 27; State National Bank of Corpus Christi v. Morgan, 135 Tex. 509, 143 SW 2d 757; O'Connor v. Quintana Petroleum Co., 134 Tex. 179, 191, 133 SW 2d 112, 134 SW 2d 1016. It is also settled by our decisions that mineral royalty affecting land in this State, granted or reserved, 'and however payable—whether in the specific product (in oil) or in money measured by the value of the product,' is an interest in the land covered by the contract. Sheppard v. Stanolind Oil &

Gas Co., supra, 125 SW 2d 649; Sheffield v. Hogg (Federal Royalty Co. v. State), supra."

See also the note in 101 A. L. R. beginning on page 884, and in 131 A. L. R. 1371. State National Bank v. Morgan, 135 Texas 509, 143 S. W. 2d 757.

We believe that the case of Evans v. Mills (C. C. A., 5th Cir.) in 67 Fed. 2d 840, applies the correct principle of law applicable to the homestead interest which petitioner, Edna Thompson, has in the oil royalty reserved. All of the contentions urged by the respondents in this cause were urged in Evans v. Mills, and Judge Hutcheson discusses each and every one of them, and holds that the lessors have a homestead interest in the royalty interest reserved under an oil and gas lease in Texas. Evans v. Mills is expressly relied upon by Judge Greenwood in Sheffield v. Hogg, 124 Texas 290, 77 S. W. 2d 1021, 1. c. bot. 1st col., p. 1028, and the Court says:

"Circuit Judge Hutcheson, in the case of Evans v. Mills et ux (C. C. A.) 67 F. (2d) 840, was squarely confronted with the necessity to determine whether 'a standard oil and gas "unless" lease * * * for a primary term of ten years, and as long thereafter as oil or gas is produced by the lessee, providing for a money rental during the primary term of $47 annually in default of drilling *and reserving a one-eighth royalty*,' left in the lessors using the leased premises for the purposes of a residence homestead any mineral estate in land, which could be conveyed only as is land constituting the family homestead. In adjudging that the lessors continued to have title to an interest in land, Judge Hutcheson rejected as 'mistaken' the argument that the effect of the lease reserving the one-eighth oil royalty was to convey away entirely all their present estate in the minerals, upon consideration of the royalty to be paid as personalty for part of the oil the lessee severed and brought up, and *by way of money* for the gas, leaving in plaintiffs no right, title, or interest in the minerals in place, except the possibility of reverter, and working an abandonment of the homestead as to these contingent interests. The opinion then declares that the lessors' interest, including the one-eighth mineral royalty, 'does not pass to the lessee, *it remains owned as realty by the lessor*,' citing the Waggoner Estate Case, 273 U. S. 113, 47 S. Ct. 271, 71 L. Ed. 566; Hager v. Stakes, Tax Collector, supra [116 Texas 453, 294 S.W. 835); and others, including Reynolds v. McMan Oil & Gas Co., supra. [Texas Com. App. 11 S.W. 2d 778.]

■ Respondents claim that an exclusive possessory interest in

property must always be present before a homestead may attach to realty. This is a general statement of the law, but is not always true. And it is claimed that a homestead right may never attach to a remainder or reversion. In the case of Posey v. Commercial National Bank (Comm. App.), 55 S. W. 2d 515, one L. H. Posey had deeded to his wife, during the pendency of a divorce action, the one-half interest in the homestead together with a life estate in his one-half interest therein. The bank thereafter took a judgment against L. H. Posey and abstracted and recorded the same. Mrs. Posey, the divorced wife, brought a suit to remove the cloud cast by the judgment against her homestead. The trial court gave judgment for Mrs. Posey removing the cloud, but this was reversed by the Court of Civil Appeals. The Supreme Court adopted the judgment of the Commission of Appeals, reversing the Court of Civil Appeals and affirming the judgment of the trial court.

Thus we see the Court recognized the homestead right of L. H. Posey in the land, even though he had no right to present possession, and had only a remainder in the land at the termination of the wife's life estate.

The case of Lawley v. Richardson, 101 Okla. 40, 223 Pac. 156, 43 A. L. R. 803 is a case holding that the surviving widow of a deceased person is entitled to receive all the royalties accruing from oil and gas wells on the homestead developed under a lease executed by the husband and wife prior to the death of the husband, and where wells had been completed prior to the death of the husband. The note on page 811 of 43 A. L. R. discusses the rights of a life tenant and remaindermen inter se as to oil and gas.

We hold that R. W. Thompson and wife, Edna, did not abandon any part of their homestead by the execution of the lease in 1925, and that the widow has such an interest in the royalties payable under the lease as will support her claim to the use and enjoyment of such royalties.

■ Second: It is contended that by the execution of the division order in 1927, R. W. Thompson and wife, Edna, conveyed away and therefore lost all their rights to the royalty oil and have a right to receive only the money value of same. With this contention we do not agree. As we read the division order the signers thereof, including the Thompsons, are recognized to be the owners of their oil royalties until it has been brought out of the ground; i. e., produced. One provision of the division

order is "The oil run hereunder shall on the terms herein contained become the property of Humble Oil & Refining Company *immediately upon being received into the possession of said company, etc. etc.*" The division order nowhere uses language showing any intention on the part of any of the parties thereto that it is, or is intended, to operate as a sale of the lessors' royalty oil in place, but operates as a sale of the oil only after it is produced and comes into the possession of the purchaser. Hogg v. Magnolia Petroleum Company, (Comm. judgment adopted by Supreme Court), 267 S. W. 482; and Stanolind Oil & Gas Co. v. Terrell, Tex. Civ. App., 183 S. W. 2d 743, writ refused.

The execution of the division order did not affect the homestead rights of R. W. Thompson and Edna Thompson in the royalty in place, reserved by their lease of 1925.

As the surviving widow of R. W. Thompson, and having renounced any. claim under his will, the petitioner herein is entitled to her statutory rights in the homestead being used by herself and her husband at the time of his death. (Constitution of Texas, Art. XVI, Sec. 52; V. A. C. S., Art. 3501.)

Third: It is contended by respondents that since the petitioner has no homestead interest in the oil and gas by virtue of having alienated and abandoned the same by the execution of the lease in 1925 and the division order in 1927, the "open mine" doctrine does not apply. Therefore, it is contended that that petitioner gets no part of the oil runs; but, if she is entitled to any part, it is only to the interest thereon.

■ It has been held by this Court that the homestead right of the survivor to continue to occupy the family homestead is in the nature of a life estate created by law. Sargeant v. Sargeant, 118 Texas 343, 15 S. W. 2d 589, 593; Rancho Oil Co. v. Powell, 142 Texas 63, 175 S. W. 2d 960, 1. c. (9), 1st col., p. 965.

■ The rights of a life tenant in the production of oil from wells which were producing at the time the life tenancy came into being, are to have the use and enjoyment of that part of the production payable under the terms of the instrument permitting the production. The case of Swayne v. Lone Acre Oil Co., 98 Texas 597, 86 S. W. 740, 60 L. R. A. 986, in an opinion by Judge Gaines discusses the rights of a life tenant in lands to receive the oil produced therefrom, and holds that oil is

governed by the same rule that applies to other minerals. (1. c., bot. 2nd col., p. 742 to top of 1st col., p. 743.)

In Petrus v. Cage Bros., et al, Tex. Civ. App., 128 S. W. 2d 537, writ refused, suit was brought by the children of Ferdinand Petrus, deceased, against Cage Bros., the lessees and operators of a caliche pit upon the homestead of Ferdinand Petrus and his surviving widow, Laura, who continued to occupy said homestead upon the death of Ferdinand. The pit had been opened by Ferdinand prior to his death and was operated by him until his death. After he died the widow alone leased the pit to Cage Bros. and they were operating it at the time of the trial. Judgment for the defendants was affirmed by the Court of Civil Appeals at San Antonio. In its opinion the Court said:

"The rule arrived at seems clearly to be that the right of survivors, such as Mrs. Petrus, is more than a mere right of possession and occupancy; it is an estate in land, in the nature of a life estate. She is a tenant for life in the homestead, the measure of her right in which is not the mere privilege of possession and enjoyment. The right encompasses 'every element of a life estate, and is therefore at least in the nature of a legal life estate, or in other words, a life estate created by operation of law.' Sargeant v. Sargeant, 118 Tex. 343, 15 SW 2d 589, 593 (Id., Tex. Civ. App., 19 S. W. 2d 382) ; Stallings v. Hullum, 89 Tex. 431, 35 SW2; Gonzales v. Gonzales, 115 Tex. 16, 273 SW 798; Hargadine v. Whitfield, 71 Tex. 482, 9 SW 475; Swayne v. Oil Co., 98 Tex. 597, 86 SW 740, 69 L. R. A. 986, 8 Ann. Cas. 1117; Woods v. Alvarado State Bank, 118 Tex. 586, 19 SW 2d 35; Clift v. Clift, 72 Tex. 114, 10 SW 338; Coffman v. Gulf, C. & S. F. R. Co., Tex. Com. App., 23 SW 2d 304; Richmond v. Sims, Tex. Civ. App., 144 SW 1142; Jones v. Dewbre, Tex. Civ. App., 13 SW 2d 233.

"The authorities cited further hold that a life tenant by virtue of the operation of law (such as Mrs. Petrus) cannot use the property upon which she is such tenant for any purpose which would work an injury to the inheritance, 'save those (purposes) only to which it had been devoted at the time the life estate came into existence,' for, 'having once had the power of committing waste, he shall not be deprived of it by the act of God.' Swayne v. Lone Acre Oil Co., supra (98 Tex. 597, 86 SW 742)

"Applying the rules stated, Mrs. Petrus, upon the death of her spouse, took an estate for life, by operation of the law, in

that part of the homestead which descended in fee, upon the death of the father, to their children, appellants herein, and by virtue of her said estate therein thus acquired, she had the right to continue to take caliche from the mine which had been opened prior to and was being operated at, the time her life estate came into existence, to-wit, at the death of her spouse, intestate."

White v. Blackman (Tex. Civ. App., 168 S. W. 2d 531, writ refused, want of merit), decided by the Texarkana Court of Civil Appeals in a case on all fours with the one at bar (except the record is silent as to the execution of a division order; but since the royalty oil produced was being sold we can safely assume that it was being purchased under a division order.) The surviving widow brought suit against the heirs under the decedent's will to have a homestead set aside to her in two tracts of land, one of which was separate property of the decedent, and also to recover "all the oil and gas royalties and proceeds therefrom which had accrued subsequent to the death of J. M. Blackman, and which would continue to accrue so long as she continued to use and occupy said properties as her homestead." Decedent and his first wife had made an oil and gas lease on both tracts of land prior to the first wife's death. Under this lease there were 41 producing wells on the two tracts at the time of the death of J. M. Blackman. Judgment was for the plaintiff in the trial court and on appeal the Texarkana Court—much against its will and belief as to what the law should be—affirmed on authority of the refusal by the Supreme Court of a writ of error in the case of Petrus v. Cage Bros., supra, and "solely for such reason." This Court refused the application for writ of error "want of merit", thus approving the judgment awarding all of the royalties and proceeds therefrom to the widow, but not approving the reasoning advanced, nor all of the pronouncements of the Court of Civil Appeals as to the law. A reading of the opinion shows that it could not have been given a "straight refusal."

See also Clayton v. Canida, Tex. Civ. App., 223 SW 2d 264, no writ history. The surviving husband brought suit against the heirs at law of his wife, Pinkie Canida, who died intestate and without leaving any children. He claimed the royalty under his wife's one-half interest in the homestead, as well as other claims not pertinent to the matter under discussion. He recovered judgment for "the other one-half of such royalties and real estate as long as he should live and use them as a homestead." The Texarkana Court affirmed the judgment of the trial

court and with reference to the complaint that Canida should not have one-half the royalties being produced from the wells at the time of the death of the wife, Pinkie, says:

"By their point 12 appellants assert that the trial court erred in decreeing plaintiff's (appellee's) homestead interest to include the right to appropriate the oil and gas royalties produced rather than impounding them for the remaindermen and allowing said homestead claimant the use of the interest earned therefrom. We cannot sustain this point. White v. Blackman, Tex. Civ. App., 168 SW 2d 531 and authorities there cited. We realize the hardship that will result from the application of the rule announced in White v. Blackman, supra, but that rule now has the sanction of the Supreme Court, and we cannot overrule it."

■ We hold that the petitioner is entitled to receive one-fourth of the royalties and the proceeds therefrom produced from those wells which were opened at the time of the death of R. W. Thompson as long as she shall live and use the family homestead.

■ We next come to consider the judgments of the trial court and the Court of Civil Appeals apportioning the Federal Estate taxes among the beneficiaries of the Estate of R. W. Thompson in the same proportion in which they received properties of value from his estate. Petitioner complains of such holding. She says that since both courts held that such Federal taxes were "debts" within the meaning of the first paragraph of testator's will, the proper judgment must be that such Federal taxes should be first paid out of the property as to which R. W. Thompson died intestate; second, out of personal property and that real estate should be the last property resorted to, and that the homestead is not liable in any event so long as there is other property in the hands of the executor out of which the taxes may be paid.

Sec. 50 of Art. XVI of the Constitution of the State of Texas protects the homestead of the family "from forced sale, for the payment of all debts, except the purchase money thereof, or a part of such purchase money, the taxes due thereon, etc." Sec. 52 of the same Article protects the heirs of a decedent in their title to the homestead, and at the same time grants the homestead right to the surviving husband or wife, for the lifetime of such survivor, or so long as such survivor may elect to use or occupy the same. Arts. 3485-3501, Vernon's Ann. Civ. Sts., 1925, as amended, provide a method for setting aside of

the homestead to those surviving and entitled to its use and also protects the homestead from forced sale, except as provided by the Constitution. These articles also show a legislative intent that the homestead of the survivors shall be free from any and all claims except those under which the Constitution permits a forced sale of the homestead.

The homestead forms no part of the estate to be administered by the probate court, and an attempted sale by the probate court of the homestead for any purpose other than that permitted by the Constitution is void. Cline v. Niblo, 117 Texas 474, 8 S. W. 2d 633, 66 A. L. R. 916, and authorities therein cited; also Reynolds Mortgage Co. v. Gambill, 115 Texas 273, 280 S. W. 531.

The case of Kubena v. Hatch, 144 Texas 627, 193 S. W. 2d 175, holds that a sale of the homestead may not be made for the poll taxes due by the owners and occupants of the homestead and is of no force and effect as to such poll taxes. This case also holds that for the ad valorem taxes assessed against the homestead it may be sold.

The homestead may not be sold to pay the general debts of the estate. Johnson v. Hampton, 117 Texas, 580, 8 S. W. 2d 640; Ward v. Hinkle, 117 Texas 566, 8 S. W. 2d 641.

The taxes due to the Federal government are not a specific charge against the homestead, but are a lien against the whole of the decedent's estate. Riggs v. Del Drage, 317 U. S. 95, 63 S. Ct. 109, 87 L. Ed. 106, 142 A. L. R. 1131). This case also states the Federal law to be that the state law shall determine the impact of the tax.

The note to above case found at p. 1135 of 142 A. L. R. quotes from 28 Am. Jur., p. 8 as follows:

"Although it is not the purpose of this annotation to discuss the distinctions between *estate and succession taxes*, except as such distinctions are necessarily involved in the consideration of decisions within the scope of the annotation, attention is called, by way of introduction, to the more apparent differences between these two types of taxes.

"It has been said: 'The term "death duties" embraces all duties occasioned by death, and hence embraces probate and estate duties, and also legacy and succession duties. A probate duty and its successor, the estate tax, is a tax upon the trans-

mission of property by a deceased person. *Such tax is charged upon the whole estate, regardless of the manner in which it is to be distributed.* It is not a tax on what comes to the beneficiaries or heirs, but upon what is left by the decedent. It is treated as an expense of administration, as a proper disbursement by an executor or administrator, for which he will be allowed credit in his account. The estate tax must be measured by the property transferred by the decedent, that is to say, the net estate ascertained in the manner prescribed, and takes no account of the relationship of the recipient or of the amount he takes. The tax comes into existence before and is independent of the receipt of the property by the legatee or distributee. A tax imposed upon the clear value of the estate passing from any person who may die seised or possessed thereof is an estate tax, and what passes to the heir or devisee and to which he acquires title is his share of the estate remaining after the payment of the tax. * * *" (Emphasis ours).

There is no question here as to the estate of R. W. Thompson being solvent, nor that the state law (in the absence of a provision in the will) controls and determines the impact of the Federal Estate taxes.

The trial court found that by the use of the word "debts" by testator, Thompson, in his will it was intended by testator to include Federal Estate taxes.

As to the homestead, it would not be liable for any of the Federal estate taxes so long as there was other property of the estate out of which these taxes could be paid. The record shows that there is sufficient property out of which the taxes can be paid without resorting to the homestead. Therefore, the homestead interest of petitioner, Edna Thompson, cannot be charged with any part of such estate taxes.

R. W. Thompson died intestate as to a part of his property; therefore, such property constitutes the residuary estate, as such is first liable for the payment of the estate taxes.

As between the personal property of the estate, we believe that in the absence of any provision in R. W. Thompson's will the personal property should first be used to pay the estate taxes. Minter v. Burnett 90 Texas 245, 38 S.W. 350; Currie v. Scott, 144 Texas 1, 187 S.W. 2d 551 (4, 5) ; Brown v. Fleming (Cavitt

v. Beall Hdw. & Impl. Co.) (Com. App.) 212 S.W. 483. See also note to 105 A. L. R., p. 320 wherein it is said:

"Although the slight authority which has been found on the question is in conflict, the recent decisions have held that, in the absence of statutory or testamentary provisions to the contrary, the burden of the Federal estate tax must be borne entirely by the personal property of the decedent, rather than apportioned between the real and personal property, on the theory that such tax comes within the general rule that debts and the expenses of administration must be paid from the personal property, in so far as it is sufficient."

Art. 3683(a) of Vernon's Civil Statutes, 1925, by its terms, can have no application here, as it shows this statute was passed to prevent inequities resulting from the inclusion of the whole value of a community estate in the Federal Estate tax valuation. The R. W. Thompson homestead and oil interest herein was wholly separate property, as was nearly all his estate. Norton v. Jones, Tex. Civ. App., 210 S.W. 2d 820, writ refused, deals only with the impact of the state inheritance taxes under the provisions of the will therein set out.

■ We next come to the petitioner's complaint of the holding of the trial court, affirmed by the Court of Civil Appeals, that certain time certificates of deposit and Series E U. S. Government Bonds were included within the terms "all cash money that may be on hand at the time of my decease."

Article FIFTH of R. W. Thompson's will reads:

"FIFTH: I give and bequeath unto my three children, hereinabove named, share and share alike, all horses and mules, that are a part of my separate and individual property, and all cash money that may be on hand at the time of my decease." (Statement of Facts, p. 9.)

On October 19, 1948, at the time of the death of R. W. Thompson, he owned as his separate estate, among others, three instruments generally designated as Time Certificates of Deposit. All were dated June 14, 1948, and being No. 6789 for $4,000.00, No. 6790 for $5,352.00 and No. 6791 for $5,438.00. Each certificate is of the following form, the amount of the certificate being in the respective amounts above:

"BELLVILLE, TEXAS                June 14, 1948, No. 6789
          This certifies that R. W. Thompson
                 Has Deposited with
          THE FIRST NATIONAL BANK of Bellville

     4,000 and     00   Dollars              $4,000.00
Payable to the order of himself
in current funds, on the return of this certificate
properly endorsed.
Six months        after date, with interest at the rate of
1 per cent per annum.
No interest after maturity.
                           /s/  H. O.  Fisher
                              V. P.  Cashier

     "The rate of interest payable hereunder is subject to change
by the bank to such extent as may be necessary to comply with
requirements of the Federal Reserve Board made from time to
time pursuant to the Federal Reserve Act."

     In the trial court's findings of fact, and in the inventory
and appraisement of R. W. Thompson's estate, it is stated that
Certificate No. 6790 is in the sum of $4,000.00, but the State-
ment of Facts shows the $4,000.00 certificate to be numbered
6789. Also the application for writ of error shows these cer-
tificates to have a notation thereon "Not subject to check."
However, the certificates, as introduced in evidence and as set
out in the Statement of Facts, do not contain any such notation.
Therefore, we do not consider any such notation in arriving at
our decision as to the meaning of such certificates.

     "Cash" is defined in Webster's New International Dictionary,
2nd Edition, Unabridged as "B. A quantity of money, C. minted
or current coin. 2, *Com.* a. money, especially ready money;
strictly coin or specie, but also, less strictly, bank notes, *sight
drafts or demand deposits at a bank.*" (Emphasis ours.) This
same authority gives the phrase "cash money" as a synonym
for the word "cash".

     A similar certificate was construed in the case of Reese v.
First National Bank of Bellville, Tex. Civ. App., 196 S.W. 2d
48, 171 A.L.R. 516, writ refused, NRE, to be a negotiable
instrument, and not to be ambiguous.

     A reading of the Certificates of Deposit issued and of the
definition of the term "cash", or its synonym "cash money" is
sufficient to demonstrate that such instruments were not "cash

money on hand" at the death of the testator. These certificates were not-payable until December 14, 1948, whereas testator died October 19, 1948. These were, at his death, negotiable instruments, passing by endorsement, and were drawing interest. It created the relation of debtor and creditor and the bank was not obligated to return the specific money deposited. 7 Am. Jur., p. 354. Russek v. Angulo, Tex. Civ. App., 236 S.W. 131, writ refused; Gueydon Brothers v. Leondra Quintanilla, 2 Willson, Unreported cases, p. 542, par. 617. This instrument was not payable on demand, and the money was not available to the testator at the time of his death.

It seems to be the universal holding that time certificates of deposit payable at a future date, and in the form of these under question, constitute negotiable instruments and are in effect the promissory notes of the issuing bank. O'Neal v. Clark, 229 Ala. 127, 155 So. 562, 94 A. L. R. 589; Farmers and Traders Bank v. Harrison, 321 Mo. 815, 12 S.W. 2d 755; Phillips v. Alford, Mo. App., 90 S.W. 2d 1060.

We hold that the certificates for $5,352.00, Item No. 41 in the inventory and appraisement, and the one for $5,438.00, Item No. 43 in the inventory and appraisement, were not "* * * cash money that may be on hand" at the time of the death of R. W. Thompson, and therefore did not pass under the FIFTH paragraph of Thompson's will, but that as to these two items R. W. Thompson died intestate, and therefore they become a part of the residuary estate.

As to the time Certificate of Deposit for $4,000.00, and being Item No. 42 in the inventory and appraisment, there is a different fact situation. It was claimed by the respondents and Roy Thompson, the independent executor, that this certificate, together with the U. S. Series E Savings Bonds costing $7,500,00 (and being Items 14-34 in the inventory and appraisement) represented $11,500.00 cash withdrawn from the account of R. W. Thompson on June 14, 1948, by Roy Thompson, and the time certificate and bonds purchased. It was claimed this withdrawal from the separate funds of R. W. Thompson was made by Roy Thompson without the knowledge and consent of R. W. Thompson, and without any authority from R. W. Thompson, and that R. W. Thompson did not have mental capacity sufficient to ratify such withdrawal and investment; therefore, the securities into which this $11,500.00 was converted should be held, in equity, to be "cash money on hand" at the time of R. W. Thompson's death, and thus passed under the FIFTH para-

graph of the will to the daughters, Ethel and Hazel, and to the son, Roy Thompson, in equal thirds.

The trial court found in favor of respondents in all of the above contentions, and that these items representing $11,500.00 passed under FIFTH paragraph of the will. This finding was affirmed by the Court of Civil Appeals. As to the two daughters, Hazel and Ethel, this finding is binding since there is evidence to support it, and is by us affirmed for the one-third interest, in the $11,500.00 of each of them.

As to Roy Thompson's one-third interest, we hold he cannot recover and must be bound by his act in withdrawing the $11,500.00. As the old saying runs "he has made his own bed, now he must lie in it." Also, he is seeking equitable relief, and he does not come into court with clean hands. He cannot take advantage of his own wrong, and he is estopped to be heard to say he did all this without authority. Mauritz v. Schwind, Tex. Civ. App., 101 S.W. 2d 1085 (10-14) writ dismissed. Therefore, one-third of this fund of $11,500.00 was not cash money on hand at the death of R. W. Thompson and must go into the residuary estate, and we so hold.

The judgment of both courts below deny a homestead interest in the royalty payable from the production of the 13 wells on the homestead is hereby reversed, and judgment rendered for the petitioner that she be paid one-fourth of such royalties so long as she shall live, or until she ceases to use the lands for her homestead.

The judgment of both courts below with regard to the Federal Estate taxes is reversed and judgment hereby rendered that such taxes be paid by the executor; first, out of the residuary estate, and if that be insufficient, next, out of the personal property of said estate.

The judgment of both courts below that the time certificates for $5,352.00 and $5,438.00 constitute "cash on hand" at the time of the death of R. W. Thompson is hereby reversed, and judgment is rendered that both certificates are a part of R. W. Thompson's residuary estate.

The judgment of both courts below that the $4,000.00 time certificate and the $10,000.00 par value of the U. S. Government Series E Bonds purchased by Roy Thompson in the name of R. W. Thompson on June 14, 1948 for $7,500.00 constituted

"cash on hand" at the death of R. W. Thompson is hereby modified in accordance with our opinion, and as modified, is hereby affirmed. Except as herein set out the judgments of both courts below are hereby affirmed. Costs in both lower courts are hereby taxed against respondents, and costs of this court are hereby taxed one-half to petitioner and one-half to respondents.

Opinion delivered January 31, 1951.

Rehearing overruled March 14, 1951.