Robert F. CREWS et ux., Appellants,

v.

GENERAL CRUDE OIL COMPANY et al.,
Appellees.

No. 5054.

Court of Civil Appeals of Texas.

Beaumont.

May 19, 1955.

Appellants' Motion for Rehearing Denied
and Appellees' Motion for Rehearing
Granted in Part June 29, 1955.

Appellees' Second Motion for Rehearing
Denied Nov. 30, 1955.

Appellants' Second Motion for Rehearing
Denied Jan. 11, 1956.

W. G. Walley, Beaumont, for appellants.

Andrews, Kurth, Campbell & Bradley, Houston, James F. Parker, Beaumont, for appellees.

WALKER, Justice.

The suit is in trespass to try title to recover interests purportedly conveyed by a mineral lease, the ground of suit being that the land leased was the homestead of the lessors, namely, the plaintiffs, R. F. Crews and wife, C. A. Crews, and that the wife never made any acknowledgment of the lease.

This lease was dated February 11, 1948, and, subject to royalties reserved by lessors, it purportedly conveyed the oil, gas, and other minerals in a number of lots, totaling 1.8 acres, in Kountze, in Hardin County, for a primary term of five years and as long thereafter as production of minerals was made under said lease. It was an "unless" lease, and it provided for annual delay rentals.

The lease was signed by both lessors. The lessee was the defendant S. P. Benckenstein. Subject to a reservation of royalties in his behalf, the defendant Benckenstein assigned this lease to the defendant General Crude Oil Company by an instrument dated February 16, 1948 (the stipula-tion at S.F. 46 seems in conflict with this paper); and by an instrument dated January 17, 1950, he assigned a part of his reserved royalty to the defendant James F. Parker. The defendant General Crude assigned one-half of its interest to the defendant Sohio Petroleum Corporation by an instrument dated July 27, 1950.

It appears from allegations of the petition that in March, 1952, the defendants General Crude and Sohio began the drilling of a well on one of the lots leased and subsequently completed the well as a producer, and that they have continuously produced minerals from the well since a date in April, 1952.

This suit was filed on February 23, 1954, about twenty-two months after production began. The lessors were the plaintiffs, as we have stated, and the defendants were the lessee and the other three parties named above, claiming under him. The cause was tried to a jury, and in response to the only special issue submitted, the jury returned a finding in behalf of the plaintiff lessors, namely, that the wife did not appear before the notary and acknowledge her execution of the lease. Defendants then moved for judgment non obstante veredicto, and this motion was granted and judgment was rendered in behalf of the defendants jointly, awarding them the interests purportedly conveyed by the lease. That is, the judgment established the validity of the lease as respects all of the land leased, in behalf of all persons claiming under it. From this judgment the plaintiffs have appealed.

Opinion

(1) It is not denied that the plaintiffs were married and were maintaining a home together at all times material to the questions to be determined.

██ (2) No question as to what constituted the plaintiffs' homestead on the date of the lease and since was submitted to the jury; but we think that the evidence shows as a matter of law that at least a part of the land leased, namely, lots 8 and 7 and probably lot 6, of Block 4 of the J. J. Allums 2nd Addition, was homestead on the date

of the lease, for this was the site of the residence. Defendants do not contend that plaintiffs ever abandoned the homestead right as to any part of these residential lots except in the minerals, but it does seem clear from all of the circumstances in evidence that the plaintiffs have continuously maintained their home in this residence since the date of this lease. The defendants say that they did so while the well was being drilled, and circumstances show that this was the same residence the plaintiffs had when the lease was made.

The well is not on this part of the land leased. It is 136 feet north of the residence, on lot 3 of said Block 4, and lot 3 is one of a group of four lots (numbered from 1 to 4, inclusive) forming one tract, which face or abut on the same street as do the residence and the three residential lots but which are separated from the three residential lots by a lot 5 which apparently does not belong to the plaintiffs. At least there is no evidence that plaintiffs own it. The dimensions of these various lots were not proved, but Mr. Sawyer's map shows them to be rectangular, and of the same size.

For evidence that the lot on which the well is located was a part of the homestead at the date of the lease (and also that lots leased other than the three residential lots were, too), the plaintiffs must depend on testimony of Mr. Coe and of the plaintiff Mrs. C. A. Crews, but the map and other testimony of Mr. Sawyer, the surveyor, must also be considered. It is not necessary to discuss the testimony of Mrs. Crews. As regards Mr. Coe, he testified on cross-examination that he "was away during that time," referring to the year 1948 in which the lease was signed. The statement is general, but it indicates that at least some of Mr. Coe's testimony about the year 1948 was hearsay. This would not be true of his testimony respecting other years. Further, Mr. Coe's testimony is too indefinite and in terms too general to show as a matter of law, if at all, that the homestead extends beyond the three residential lots (Nos. 8, 7 and 6), when it is considered

with Mr. Sawyer's map and testimony showing how the property leased was divided into non-contiguous tracts. Mr. Sawyer's map was not questioned and his testimony about the separation and location of the various tracts was not contradicted. The photograph, defendants' exhibit 1, does not show as a matter of law that the site of the well was a part of plaintiffs' yard when it was taken. It must be considered with defendants' exhibit 12, and both photographs taken together indicate that the area near the well is not cared for as a part of the yard and that the lots, Nos. 1 and 2, on the side away from the residence, are not used for any purpose. As regards lot 3, on which the well is situated, and the other three lots which with it form a single tract, namely, lots 1, 2 and 4, it seems to us that the plaintiffs have done no more, if they got that far, than make an issue for the jury, whether this property was a part of the homestead at the date of the lease. It is not necessary for us to determine whether the evidence actually did make this issue, for the question was not submitted to the jury and so was waived.

The lease covered four other lots in said Block 4, which we have not mentioned, namely, lots 9, 11, 13 and 15; but there is no evidence that these were a part of the homestead on the date of the lease, and there is no evidence that any of the other lots leased which are not in said Block 4 were ever a part of the homestead.

(3) Mrs. C. A. Crews testified that she never appeared before the notary whose certificate of acknowledgment is appended to the lease, or before any other notary. She said that the lessee's agent came to her house, procured her signature to the lease, and took the lease away with him, and "I believe they told me that it was carried up to Mr. Englin's office and fixed up" When she got this information the evidence does not show. The agent, Pipkin, and the notary, Englin, both testified that they went together to Mrs. Crews' house and that she signed the lease there and then acknowledged her execution of the lease to the notary as the law requires.

■■ This testimony made the issue for the jury, whether Mrs. Crews appeared before the notary or not. It was not necessary that Mrs. Crews' testimony be corroborated to make this issue for the jury. Ward v. Weaver, Tex.Com.App., 34 S.W. 2d·1093; Robertson v. Vernon, Tex.Com. App., 12 S.W.2d 991; Keller v. Downey, 143 Tex. 171, 183 S.W.2d 426, at pages 428, 429. We are not now concerned· with the question, whether the evidence of non-appearance before the notary is sufficient in fact as well as in law, because the judgment was rendered non obstante veredicto; but conclusions stated elsewhere in this opinion show that we do not agree that circumstances support the agent's and the notary's testimony to the extent contended for by the defendants. For the court's duty concerning the sufficiency of evidence, see: In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, and decisions cited therein.

(4) The issue submitted to the jury, with the jury's answer, was as follows: "Do you find from a preponderance of the evidence that Mrs. Cora A. Crews did not, on the occasion in question, appear before Frederick L. Englin in her home and acknowledge the instrument in question to him?" *Answer:* "She did not appear and acknowledge said instrument."

Defendants make this counterpoint: "The jury finding that Cora Crews did not appear *and* acknowledge the lease is not a finding that she did not appear *or* acknowledge the lease; and, under Rule 279 [Texas Rules of Civil Procedure], a finding that she did appear is presumed in support of the judgment."

■ We construe the finding as meaning that Mrs. Crews did not appear before the notary. The issue made by the evidence has been stated and this makes plain the finding of the jury. There was no evidence that Mrs. Crews did appear before the notary but did not acknowledge her execution of the lease, or did not fully acknowledge it, and the trial court obviously was attempting to submit the only issue made by the evidence. Further, special issues considered in Robertson v. Vernon, Tex.Com.

App., 12 S.W.2d 991, were in analogous form and were so construed.

■ (5) There was no evidence that Mrs. C. A. Crews ever ratified the lease so that it became effective. After the lease was made the marriage continued to exist. Defendants do not claim an abandonment of any part of the surface except that enclosed by the fence around the well and the circumstances show that the homestead did continue on the residential lots. Mrs. Crews said that she never did acknowledge execution of the lease. So, to accomplish a ratification by Mrs. Crews, the wife, she must have executed a writing and duly acknowledged her execution thereof so as thereby to comply at least indirectly with the provisions of statutes and of Art. 16, § 50, Vernon's Ann.St.Const., pertaining to a conveyance of the homestead. *For statutes see:* Arts. 1300, 4618, 6605 and 6608, Vernon's Ann.Civ.St. *For constructions of the constitutional provision and of some of these statutes see:* Green v. Windham, 115 Tex. 162, 278 S.W. 1101; Stallings v. Hullum, 89 Tex. 431, 35 S.W. 2; Garner v. Black, 95 Tex. 125, at pages 130–131, 65 S.W. 876; Nunn, Texas Homesteads, Sections 9 and 10; 22 Tex.Jur. 124, Sec. 87. Also see: Humble Oil & Refining Co. v. Downey, 143 Tex. 171, 183 S.W.2d 426. *Concerning ratification see:* Thomas v. Williams, 50 Tex. 269, at page 275; Logan v. Aiken, Tex.Civ.App., 123 S.W.2d 401; Hill v. McIntyre Drilling Co., Tex.Civ. App., 59 S.W.2d 193, at page 197; Cleveland v. Milner, 141 Tex. 120, 170 S.W.2d 472, at page 476 (Hn. 7); Woods v. Alvarado State Bank, 118 Tex. 586, at page 592, 19 S.W.2d 35, at pages 36–37; Grissom v. Anderson, 125 Tex. 26, 79 S.W.2d 619; Gose v. Burnett, Tex.Civ.App., 60 S.W.2d 886.

■ We do not agree with the defendants that the evidence shows any appropriation by Mrs. Crews of the delay rental payments; but if she had appropriated these payments, this act would only be an appropriation of proceeds of the lease and would not effect a ratification of the lease or, considered alone, an estoppel against Mrs.

Crews, the wife, to deny the validity of the lease, since to give such conduct that effect would be inconsistent with the statutory and constitutional requirements cited above. It is for this reason that a married woman's appropriation of the proceeds of an invalid conveyance of her separate property does not estop her to recover her property. The rule is stated in City of San Antonio v. Grandjean, 91 Tex. 430, at page 432, 41 S.W. 477, at page 478, 44 S.W. 476. And also see the decisions cited elsewhere in this opinion concerning the effect of the wife's acquiescence in improvement of her separate property. Texas Osage Co-operative Royalty Pool v. Sullivan, Tex.Civ.App., 93 S.W.2d 566, an opinion of this court, is not in point on the facts, but statements in that opinion conflicting with our own conclusion, if any there be, are overruled to the extent of the conflict.

(6) The principal contention made in support of the trial court's judgment is, that Mrs. C. A. Crews is estopped as a matter of law to deny the validity of the lease (not to recover the well but to deny the validity of the lease) even if the homestead was situated on property leased when the lease was made. We have mentioned the evidence concerning the signature and acknowledgment of the lease by Mrs. Crews and the jury's finding that she did not acknowledge it. The other evidence pertaining to the contention of estoppel is the following:

a. The property leased was the community property of the lessors on the date of the lease.

b. Lessee's agent delivered his check for $155 to the husband on the date of the lease in payment of the consideration stated in the lease. The agent testified that he delivered it to Mr. Crews, not to the wife, Mrs. C. A. Crews. This check was payable to Mr. Crews alone and it was endorsed by him alone, and as we construe the testimony of the wife it does not show that she participated in any action concerning the check or its proceeds. See: S.F. 76–77. She had no power of control over check or proceeds.

c. The lease provided for annual delay rentals of $15.50, and the defendant General Crude paid these rentals annually for four years into the depository bank named in the lease, directing the bank in the case of each payment to credit the payment to the lessors jointly, that is, to both Mr. and Mrs. Crews, and the bank credited these payments as directed. However, there is no evidence that the plaintiffs, or either of them, have appropriated any of these payments; and, the deposits being credited to lessors jointly, Mrs. C. A. Crews' testimony (S.F. 77) that she and her husband had never signed any checks jointly indicates that the rentals never had been appropriated. This testimony does indicate that Mrs. Crews had at some time learned of the deposits, but it does not prove this as a matter of law.

d. Mrs. Crews and her husband occupied the residence while the well was being drilled and so knew that the well was being drilled from the time that this operation began, and it seems plain from all of the circumstances that neither made any objection to this. The cost of the well was very great. Mr. Cutbirth, who testified that he was a vice-president, and the manager of the Land Department of the defendant General Crude, testified as follows: "That well completed cost approximately $120,000.00, exclusive of the tank batteries. That was another $7,000 or $8,000, making total cost of approximately $127,000 or $128,000."

It must also be true that both of the plaintiffs knew the well was being drilled under the lease, and so knew, or were necessarily charged with knowing, that the defendants were asserting a right to act under the lease.

It is not so clear to us that the evidence proves that the defendants General Crude, Sohio and Parker were ignorant of the facts concerning the acknowledgment before the well was begun or completed, or that the defendants General Crude and Sohio were misled by Mrs. Crews' conduct when they drilled the well (Mr. Parker did

not participate in drilling the well), but we will assume that these facts were proved as a matter of law. The circumstances pertaining to these matters are strongest in behalf of General Crude; but these circumstances do indicate that the plaintiffs said nothing about this acknowledgment until after the well was drilled. See Mrs. Crews' testimony at S.F. 75 and at S.F. 77 to 79, inclusive. As regards the lessee Benckenstein, he would be charged with the knowledge of his agent who procured the lease from Mrs. Crews.

The conduct of Mrs. Crews, the wife, now to be considered is, of course, simple inaction and silence, involving no affirmative representations nor any affirmative suppression of facts, and if it produce an estoppel against the wife it does so by virtue of her mere acquiescence in the drilling of an expensive well on her homestead while she was in possession of the homestead. Furthermore, nothing in the way of a fraudulent intent accompanying her inaction was proved against Mrs. Crews as a matter of law. Testimony of Mrs. Crews at S.F. 73 shows that at some time she learned that a notary's certificate had been made, but the evidence does not show when she got this information. And her testimony made an issue for the jury, whether she knew when she signed the lease that she had to acknowledge her execution of it before a notary; and when she did learn the necessity of such an acknowledgment does not appear. What would be a fraud (or other conduct) sufficient to estop Mrs. Crews, the wife, from denying the validity of the lease we shall not undertake to say, but it seems to us that, on these conclusions, the facts which were proved as a matter of law do not include any element of fraudulent intent by Mrs. Crews while the well was being drilled.

■■ In determining the effect of such conduct on the part of the wife, it is to be borne in mind that the burden of proof to show estoppel is on him who claims one in his behalf. Nixon v. Hirschi, 134 Tex. 415, 136 S.W.2d 583. Further, that under the evidence none of the defendants could be innocent purchasers as regards Mrs. Crews' failure to acknowledge execution of the lease. See: Wheelock v. Cavitt, 91 Tex. 679, 45 S.W. 796; Yaseen v. Green, Tex.Civ.App., 140 S.W. 824; Cosgrove v. Nelson, Tex.Civ.App., 269 S.W. 891, affirmed on other grounds Tex.Com.App., 277 S.W. 1118; Lummus v. Alma State Bank, Tex.Civ.App., 4 S.W.2d 195, at page 198. And see again: Humble Oil & Refining Co. v. Downey, 183 S.W.2d 426, at page 428. On the evidence the defendants either knew, or were charged with knowledge of Mrs. Crews' marital status and of the homestead's existence when the lease was made and when the well was drilled, and so were charged with notice of the legal consequences of these facts. See: Daniel v. Mason, 90 Tex. 240, 38 S.W. 161; Johnson v. Bryan, 62 Tex. 623, at page 626. For an illustration of the effect which constructive notice of another's rights may have as regards the matter of estoppel see: Colquitt v. Eureka Producing Co., Tex.Com.App., 63 S.W.2d 1018, motion for rehearing overruled, Tex.Com.App., 67 S.W.2d 224. Further, the Supreme Court has held that a wife's mere acquiescence in the erection of valuable improvements on the homestead did not estop her to reclaim the property, although this decision doubtless now must be considered with others involving the matter of abandonment. Eckhardt v. Schlecht, 29 Tex. 129. And it has several times been held that a wife's mere acquiescence in the erection of valuable improvements on her separate property under an invalid conveyance did not estop her or her heirs to attack the conveyance for noncompliance with the statutory requirements pertaining thereto. See: Williams v. Ellingsworth, 75 Tex. 480, 12 S.W. 746, commented upon in McLaren v. Jones, 89 Tex. 131, at page 135, 33 S.W. 849; Johnson v. Bryan, 62 Tex. 623; Fitzgerald v. Turner, 43 Tex. 79; Berry v. Donley, 26 Tex. 737; Steed v. Petty, 65 Tex. 490; Cole v. Bammel, 62 Tex. 108, at page 115 et seq., on motion for rehearing. The matter of abandonment which may occur in the case of a home-

stead does not appear in these cases involving the wife's separate property, but these decisions do have a direct application to the case of the homestead and to the issue of estoppel now under consideration, for the provisions enacted governing conveyances of the homestead are similar to those governing conveyances of the wife's separate property and both sets of provisions were intended to protect the wife. The courts have manifested as much concern for protection of the wife's homestead rights as for her separate property, and the wife's homestead right is, itself, at least in the nature of a property right and is not a mere personal exemption. See: Woods v. Alvarado State Bank, 118 Tex. 586, 19 S.W.2d 35; Sargeant v. Sargeant, 118 Tex. 343, 15 S.W.2d 589; Thompson v. Thompson, 149 Tex. 632, 236 S.W.2d 779.

 Furthermore, it is the rule that where one is only inactive and silent, he will not be estopped for failing to speak unless it can be said that he was under a duty to speak, and normally that duty does not exist when one does not know what his rights are, although, perhaps, he may be bound to know them under some circumstances. See: Moore v. Carey Bros. Oil Co., Tex.Com.App., 272 S.W. 440, 39 A. L.R. 1247; Wright v. Bonta, 19 Tex. 385; Richey v. Miller, 142 Tex. 274, 177 S.W.2d 255, 170 A.L.R. 832; Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, at page 932. Our conclusions regarding the evidence show that it was not proved as a matter of law that Mrs. Crews, the wife, knew that she had any right to object to the drilling of the well. Was she bound to know this, as against the defendants? Such knowledge may involve or even depend on knowledge of a matter of law, to wit, the legal necessity of her acknowledgment of the lease. Was she, as against the defendants, charged with such knowledge of the law pertaining to this matter that she was bound to speak when they began the well or be subjected to an estoppel regarding well or lease? We think not, for if she were, the requirement of her acknowledg-

ment of the lease would simply be abrogated in this situation, and it is in this situation that the rules of decision just stated have charged the defendants with knowledge of facts and law. Concerning this matter see: Yaseen v. Green, Tex. Civ.App., 140 S.W. 824; Cosgrove v. Nelson, Tex.Civ.App., 269 S.W. 891, affirmed on other grounds Tex.Com.App., 277 S.W. 1118; Burkhardt v. Lieberman, 138 Tex. 409, 159 S.W.2d 847, at page 852 (discussion of abandonment). The wife was not charged with such a burden in the cases involving improvement of her separate property. Normally, the defendants would be bound to determine for themselves, before they began the well, that the law governing the conveyance of the homestead had been complied with, and the evidence now under consideration does not take the defendants out of this rule as a matter of law.

 We hold that the evidence does not show as a matter of law that Mrs. C. A. Crews was estopped to deny the validity of the lease on the ground on which she now attacks it.

 (7) We have discussed matters pertaining to the validity of the lease as a whole, and we turn now to the question, whether the plaintiffs had any right to the well. As we have stated, the plaintiffs knew that the well was being drilled but made no objection to it. Mrs. Crews said that it took six weeks to drill the well. This operation required the use of a part of the land leased, and the nature of the operation implies that the use was exclusive, that the area so used ceased to be in the possession of the plaintiffs, and that it was in the exclusive possession of the defendant General Crude or of said defendant and its associate, the Sohio, while the operation continued. Upon completion of the well the drilling equipment was removed, and what is referred to in the evidence as a flow line was attached to the well. This line is pictured in defendants exhibits 1 and 12; it is a pipe which carries the product of the well away from the property. About twenty days after the well was

completed, a metal fence taller than a man, with three barbed wires at top, was erected around the well, apparently in the form of a rectangle (defendants' exhibit 12 is a picture of the fence), and this fence has been in place since its erection. The area enclosed is quite small, seemingly only enough to allow some operation on the well or the line attached if any prove necessary, and its use appears to be strictly appurtenant to the well. See: Strang v. Pray, 89 Tex. 525, 35 S.W. 1054. The exposed position of the well-head and the line attached show that the fence was put up to protect this property from intruders. There is a gate in the fence, but it has been kept locked to all except employees of some of defendants (apparently those of General Crude), and the plaintiffs have had no access to the area inside this fence, and this area has not been in their possession since the fence was put up. The possession of this area has been and is that of defendants General Crude and Sohio. There is nothing to show that the plaintiffs objected to the erection of this fence or to their exclusion from the area within it before this controversy began, and we will assume that they did not, as the circumstances certainly suggest, and further, that they acquiesced in their exclusion from this area until the present controversy did arise. We have held in part (2) that it was not proved as a matter of law that the property on which the well was situated was a part of the homestead, but if this fact had been established the conduct of the plaintiffs which we have just described would have accomplished an abandonment by them of that part of the homestead which supported and was enclosed by the fence around the well. See: Peterman v. Harborth, Tex.Com.App., 300 S.W. 33; Medlenka v. Downing, 59 Tex. 32; Hudgins v. Thompson, 109 Tex. 433, at page 436, 211 S.W. 586; Speer's Law of Marital Rights, Sec. 490. The lease, duly executed by the husband, then would have become operative as to this area at the time of the abandonment, the property being community property of plaintiffs. Hill v. McIntyre Drilling Co., Tex.Civ.App., 59 S.W.2d 193, at page 195; Peterman v.

Harborth, supra; Grissom v. Anderson, 125 Tex. 26, 79 S.W.2d 619, at page 621.

We attach no significance, on the evidence before us, to the fact that the area abandoned, if of the homestead, was only a part of the leasehold in suit. Furthermore, we attach no significance to the fact that the execution of a valid lease of the oil, gas and other minerals like that in suit is not, itself, an abandonment of the lessors' homestead right in the surface and in the other interests retained by them. See: Thompson v. Thompson, 149 Tex. 632, 236 S.W.2d 779. Nor do we attach any significance to the fact that among the interests retained by lessors under a lease like that in suit is a reversionary interest and that the lessees' interests end when production stops. For if we are correct in the assumption stated, the plaintiffs had plainly given up to the defendants the area within the fence before this controversy began, and we think that on the facts summarized, we could say as a matter of law that until this controversy began the plaintiffs had no more definite or immediate intention of resuming the use of the area within the fence as a part of their homestead than have claimants in cases where a part of the homestead has been appropriated for tenant houses or other rental properties apart from the residence and its appurtenances. See: Medlenka v. Downing, supra; Atwood v. Guaranty Construction Co., Tex. Com.App., 63 S.W.2d 685; Mays v. Mays, Tex.Civ.App., 43 S.W.2d 148; Strang v. Pray, supra. The lessee's interest under the lease in suit is a determinable fee and, production occurring as it has here, this interest will exist indefinitely and may do so forever. See: Summers, Oil and Gas, Sec. 165. This is true of the well in suit, and the appropriation of surface made by the defendants General Crude and Sohio for the purposes of the well, a use inconsistent with use of the appropriated area for the purposes of a homestead, must be measured accordingly. It is not unfair to assume that the plaintiffs were aware of these matters, at least after the well proved to be a producer. The rule of de-

cision stated in Burkhardt v. Lieberman, 138 Tex. 409, 159 S.W.2d 847, and other decisions cited herein concerning intention to abandon has been complied with.

██ The defendants argue that the abandonment is not limited to the area supporting and enclosed by the fence around the well and that the abandonment extends to all of the minerals conveyed by the lease, under as well as beyond the limits of any homestead, but we overrule this contention because of the conclusions just stated. That is, abandonment of the homestead right in the minerals would validate the lease as regards the area abandoned and would therefore subject the surface above these minerals to use for the purposes of the lease; and this use, when actually made, would manifestly be inconsistent with use of the surface for the purposes of a homestead. Consequently, the fact that the plaintiffs continued to use and occupy the remainder of the homestead while abandoning to the defendants the small area within the fence about the well shows that they intended nothing which would interfere with their use of the remainder of the homestead. And abandonment, as decisions already cited show, involves intention. Of the plaintiffs, we cannot say that the wife, at least, intended any such result as the defendants contend for. We think that the rule concerning adverse possession of minerals applied by this court in Kilpatrick v. Gulf Production Co., Tex.Civ.App., 139 S.W.2d 653, at page 657, is not applicable to this case, because this case involves a matter of intention not involved in that case. And we do not agree with defendants that the husband can abandon the minerals in the homestead without the wife's consent while the homestead continues in the surface. Nor can we, as the defendants suggest in the alternative, segregate the surface of the residential lots, denying defendants access to this, while at the same time decreeing an abandonment of the minerals in these lots. For if abandonment of minerals means anything it validates the lessee's rights in the surface, as we have stated; and these provisions of a decree would be inconsistent.

(8) The primary term of the lease has expired, but the evidence about the payment of delay rentals and the plaintiffs' allegations about the drilling of the well and the production had therefrom show that the lease is in force, if it is not invalid for lack of the wife's acknowledgment.

(9) The lease is valid as regards that part of the property leased which was not a part of the homestead when the lease was signed and delivered to the lessee's agent, but the evidence concerning the area and location of the homestead has not been fully developed. There are other uncertainties in the evidence. The cause, therefore, will be remanded generally.

The judgment of the trial court is reversed and the cause is remanded.

## On Motions for Rehearing

Both parties have filed motions for rehearing.

Appellants' motion is overruled. As regards Ground 2, plaintiffs' allegations about the drilling of a well and production from this well are not made in the alternative and are not inconsistent with other allegations of theirs.

Appellees' motion is granted in part. Ground I assigns as error that the trial court's judgment should have been affirmed as to the fenced area about the well. We have reexamined the evidence and have concluded that, from all the circumstances in proof, the evidence being considered as a whole, it appears as a matter of law that the plaintiffs acquiesced in the exclusive appropriation of the area supporting and enclosed by the fence around the well, made by those of the defendants who drilled this well, and did in fact abandon this area as a part of their homestead, if ever it was a part of that homestead. There is no field note description of this area in the record, but Mr. Sawyer's map shows that well and fence are on lot 3 of

the land leased, and contains a scale of measurements by which a field note description, perhaps approximate, might be fabricated. The fence itself is an artificial monument which plainly would not be confused with any other. It may be that we could render final judgment here as regards this fenced area, but a more explicit and clearly accurate description of said area may be to the parties' interest and to get this we amend our judgment as follows: On remand, the trial court is directed to sever the suit as respects this fenced area around the well from the suit as respects the rest of the land sued for by plaintiffs, and having done so, to procure an adequate field note description of this fenced area, that is, the land supporting and enclosed by this fence around the well, and then to render final judgment in defendants' behalf, that, plaintiffs take nothing as regards said land. See: Medlenka v. Downing, 59 Tex. 32, at page 39; Wynne v. Hudson, 66 Tex. 1, at pages 12–13, 17 S.W. 110, at pages 114–115; Cooper v. Austin, 58 Tex. 494; Fielder v. Houston Oil Co., Tex.Com.App., 208 S.W. 158; Id., Tex.Com.App., 210 S.W. 797; Sam Bassett Lumber Co. v. City of Houston, 145 Tex. 492, at page 498, 198 S.W.2d 879, at page 883. To this extent 'Ground I of appellees' motion is sustained. All other grounds of appellees' motion for rehearing are overruled, and except as amended our judgment of remand remains in force. In substance, we are directing a retrial of that branch of the cause which concerns the land in suit other than the fenced area around the well on Lot 3. We add the following comments.

We do not agree with appellees' interpretation of the Commission's opinion in Peterman v. Harborth, Tex.Com.App., 300 S.W. 33. The Commission did not give effect to a conveyance of homestead property. Instead, they gave effect to a conveyance of land which was *not* homestead. This land, because of the abandonment, had ceased to be homestead, and so the parol conveyance was enabled to operate as in other cases.

■ We remain of the opinion that the plaintiffs' abandonment did not extend beyond the fenced area around the well. Abandonment of homestead rights is matter of intention and we see no reason to extend the intention beyond the surrender actually made; and this surrender was of a part only of the area alleged to be homestead. Retention and continued use of the rest of the homestead for homestead purposes logically ought to be, and we think is, a circumstance indicating that the owner intended nothing inconsistent with continuance of such use, and appropriation of any part of the surface for the purpose of the lease would be inconsistent, in fact, with continuance of homestead use. Assuming for discussion, as we have done, that the well is on property once homestead, the question simply is, did the homestead owners intend to abandon more than they actually gave up. Decisions that execution of an oil/gas lease does not, of itself, effect an abandonment of homestead rights in land leased are not in point because the intention to subordinate the surface to use for lease purposes is settled by an expression of intention and such a question as exists in this case does not exist in those cases.

Appellees have filed an offer to surrender the surface estate in lots 8, 7 and 6, and this, we assume, was done to support their contention that abandonment extended to all interests purportedly conveyed by the lease, by removing the possibility of interfering with homestead uses by using this surface area to get at the minerals below, or for other lease purposes. However, appellants have refused to accept this offer, and so the offer cannot be given any effect, since abandonment either did or did not occur before this suit was filed. If no abandonment happened, this offer cannot now effectuate one and so cannot help the argument that one should be declared.

### On Appellees' Second Motion for Rehearing

Grounds I and II are overruled on the authority of Colbert v. Dallas Joint Stock Land Bank of Dallas, 129 Tex. 235, at pages 244, 245, 102 S.W.2d 1031, at page 1036. The evidence pertaining to these grounds

has not been fully developed and the plaintiffs' waiver of issues by failure to request is not material to our conclusion that a remand should be made.

Ground V apparently assigns error to our conclusion that the evidence proves as a matter of law that the lots on which plaintiffs' residence is situated were homestead property on the date of the lease. We have reconsidered this evidence and we adhere to our conclusion. The defendants, that is, the appellees, did not contest this issue in the trial court yet plainly could have done so for, of their witnesses, at least Pipkin, Englin and Tebbs had information about the facts. On the other hand, the parties stipulated that the property was community on the date of the lease. The photograph of the plaintiffs' dwelling, defendants' exhibit 1, shows shrubbery and trees which must be several years old. Mrs. Crews' description of the dwelling where she signed the lease shows that it was the home of herself and her husband, and she described it and the dwelling in which she resided at the time of the trial in such a way as to identify the two. Her statements identifying trees destroyed by the drilling operations with trees on the property leased tend toward the same end. Mr. Coe's testimony on direct examination shows that he was 29 years old at the time of trial, that he had been familiar with the property all of his life, and that plaintiffs, who were his grandparents, had resided on the property all of that time. His testimony on cross-examination is consistent with this. That he was away in, or at some time in, 1948 does not detract from the force of his testimony concerning the long period before and after that year; and persistence of residence during the time of his actual knowledge is strong confirmation of Mrs. Crews' testimony. Mr. Coe identified the photograph of plaintiffs' present dwelling, defendants' exhibit 1, as the plaintiffs' house and said that "the house seems to be just like it always was." This is plainly the house he had always known as plaintiffs' residence. We have referred to defendants' witnesses Pipkin, Englin and Tebbs. Mr. Pipkin said that after he procured Mr. Crews'

signature, he and Mr. Englin went over to "his residence", that is, Mr. Crews' residence, and procured Mrs. Crews' signature and acknowledgment. On the date of the lease, Mr. Englin, the notary, resided in the same town in which plaintiffs resided and he has lived there since. He said that he and Mr. Pipkin "went first to the store of Mr. Crews over on the highway and I took his acknowledgment and then we went to the *home* of Mrs. Crews and took her acknowledgment to this instrument." He said: "I believe the house faces east." This statement is in accord with Mrs. Crews' description of the house in which she signed the lease. Mr. Tebbs said that he had lived all of his life in Kountze, the town in which the property was situated; that he had known plaintiffs all of his life; and that he had had occasion to go on the premises many times before the well was drilled; and that he had only seen the plaintiffs in the house. Mrs. Crews' testimony shows that plaintiffs resided on the property while the well was being drilled. On the evidence, the question, whether any of the property leased was plaintiffs' homestead on the date of the lease, depends on whether the house in which Mrs. Crews signed the lease is the same house in which she resided when the well was drilled and the cause was tried, and we think that the evidence proves as a matter of law that this was true. The statements of the defendants' witnesses and, under the circumstances, defendants' acquiescence in the testimony of Mrs. Crews and Mr. Coe afford sufficient confirmation of that testimony if any confirmation be needed.

Other grounds for rehearing have been considered but are overruled, and appellees', that is, defendants' second motion for rehearing is denied.

### On Appellants' Second Motion for Rehearing

Since our last opinion was filed, overruling appellees' second motion for rehearing, the appellants have filed their own second motion for rehearing, and the appellees, in reply, have filed a motion to strike it because it was filed after the time

limited by Texas Rules of Civil Procedure, rule 458. Appellees are correct in this contention because the opinion overruling appellants' first motion for rehearing was filed on June 29th; the later filing of the opinion overruling appellees' second motion for rehearing did not authorize appellants to file another motion for rehearing in their own behalf within fifteen days thereafter, nor did the substitution of pages in our original opinion. The pages substituted changed only the form of expression, not holdings made. Accordingly, appellants' second motion for rehearing is subject to being stricken insofar as it states any ground for changing, or prays for any change in, the judgment of this court; but this document does contain a criticism of language in our opinion of June 29th which shows that appellants have misinterpreted this language. We infer from the preamble of appellees' second motion for rehearing that appellees correctly understood our holding, but that there may be no misunderstanding of our intention we make the following statement.

The language referred to in the opinion of June 29th is the direction to the trial court "to render final judgment in defendants' behalf, that plaintiffs take nothing as regards said land"; the land referred to is the small fenced area about the well. This language in the opinion of June 29th was made with reference to the lease, not with reference to the title to the land independent of the lease, and so the trial court, in complying with our instructions on remand, should not simply render judgment that appellants take nothing as regards this fenced area but, instead, should render judgment that appellants (the plaintiffs) take nothing against the appellees (the defendants) as regards the estates, rights, interests and privileges in, respecting or appertaining to, said fenced area which the oil, gas and mineral lease in suit purports to convey. The clerk is directed to draft the judgment of this court accordingly.

But to refer again to appellants' second motion for rehearing: The contention based on paragraph 5 of the lease (which constitutes that part of the motion other than the criticism of language in our opin-

ion of June 29th) would be overruled if the motion to strike had not been filed. If succeeding provisions of paragraph 5, with provisions concerning rental which are in paragraphs 3, 6, 8 and 9 of the lease, do not provide for annual delay rentals, then under paragraph 2, the lease would run for five years without rentals, and the well was drilled within this five years.